2003-NMCA-007

61 P.3d 201

**Robert HAGEBAK, Plaintiff–Appellant,**

v.

**Anita STONE, Defendant–Appellee.**

**No. 22,486.**

Court of Appeals of New Mexico.

Dec. 9, 2002.

Richard A. Allen, The Law Office of Richard A. Allen, Albuquerque, NM, for Appellant.

Jack N. Hardwick Sommer, Udall & Hardwick, P.A., Santa Fe, NM, for Appellee.

## OPINION

BOSSON, Chief Judge.

{1} This appeal involves two overlapping claims in tort: defamation and prima facie tort. In granting summary judgment against Robert Hagebak on his defamation claim, the district court held, as a matter of first impression in New Mexico, that intracorporate communications among corporate employees and agents are not "published" to third parties, and therefore cannot be the basis for a claim in defamation. The district court also granted summary judgment against the claim in prima facie tort, because it was based on the same alleged conduct as the claim for defamation. We reverse summary judgment on both claims and remand for further proceedings.

## BACKGROUND

{2} Hagebak is a psychologist who practiced in Texas for thirty years before moving to New Mexico in June 1995 to accept a position with Los Alamos Family Council (LAFC). During Hagebak's employment at LAFC, Anita Stone was LAFC's fiscal officer and Michael Duxler was the clinical director. In January 1996, Duxler terminated Hagebak's employment with LAFC. During testimony at a corporate grievance hearing requested by Hagebak, Stone described Hagebak's patient load, productivity, billing, and the fiscal impact of Hagebak's performance. Stone's testimony was largely critical of Hagebak. Following the hearing, the LAFC Board of Directors voted to deny Hagebak's request for reinstatement.

{3} Hagebak filed suit against LAFC, Duxler, and Stone in January 1999, alleging in several different counts that he had been unjustly terminated and damaged in "an effort to cover up improprieties in [LAFC's] billing and fiscal management." This appeal concerns only Hagebak's claims against Stone for defamation and prima facie tort. Hagebak contended that Stone made false statements about him at the grievance hearing and portrayed him as incompetent in his profession, adversely affecting his chances for reinstatement and damaging his professional reputation. The district court granted summary judgment against Hagebak on those claims and Hagebak appeals.

## DISCUSSION

{4} Summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Ciup v. Chevron U.S.A., Inc.,* 1996–NMSC–062, ¶ 7, 122 N.M. 537, 928 P.2d 263. We construe all reasonable inferences in favor of the party opposing summary judgment and consider the factual merits of the issues raised in the light most favorable to support a trial on the merits. *Ruiz v. Garcia,* 115 N.M. 269, 271, 850 P.2d 972, 974 (1993); *Sarracino v. Martinez,* 117 N.M. 193, 194, 870 P.2d 155, 156 (Ct.App.1994). We review the summary judgment de novo as an issue of law. *Self v. United Parcel Serv., Inc.,* 1998–NMSC–046, ¶ 6, 126 N.M. 396, 970 P.2d 582.

**Defamation: Intracorporate Communication Exception to Publication**

{5} Defamation, which is defined in New Mexico as a wrongful and unprivileged

injury to a person's reputation, requires publication to be actionable. *See* UJI 13–1001 NMRA 2002 (defining defamation); UJI 13–1002(B) NMRA 2002 (listing elements of defamation action, including publication); *see also Clough v. Adventist Health Sys., Inc.*, 108 N.M. 801, 806, 780 P.2d 627, 632 (1989) (describing publication element of defamation). The publication requirement is based on the assumption that a statement, neither seen nor heard by a third party, cannot cause harm to one's reputation. Frank J. Cavico, *Defamation in the Private Sector: The Libelous and Slanderous Employer*, 24 Dayton L.Rev. 405, 430 (1999). In New Mexico, publication is defined as "an intentional or negligent communication to one other than the person defamed." UJI 13–1003 NMRA 2002 (emphasis omitted).

{6} A number of jurisdictions have recognized an intracorporate communication exception to the law of defamation, holding that communications among the employees, officers, or agents of a corporation are not "published," because they do not extend beyond the corporation. *See, e.g., Starr v. Pearle Vision, Inc.*, 54 F.3d 1548, 1553 (10th Cir. 1995) (applying Oklahoma law and holding that communication between agents or representatives of a corporation does not constitute publication). New Mexico courts have not previously discussed whether to recognize this exception under New Mexico law, and accordingly, we address the question as a matter of first impression.

{7} In electing to adopt this exception, the district court ruled that each of Stone's statements was "an intracorporate communication made by [Stone] within the scope of her duties as an employee of [LAFC]. Therefore, [Stone] did not publish defamatory statements concerning ... Hagebak. Since there was no publication, there is no cause of action for defamation." The parties agree that Stone's statements were intracorporate communications made by Stone within the course of her employment at LAFC to other employees and agents of the corporation. Thus, the only remaining question is whether the district court was correct in recognizing the exception under state law. We now turn to an analysis of that question.

{8} Courts are split over the intracorporate communication exception. *See generally* Jane M. Draper, Annotation, *Defamation: Publication by Intracorporate Communication of Employee's Evaluation*, 47 A.L.R.4th 674, 1986 WL 361438 (1986); 1 Robert D. Sack, *Sack on Defamation* § 2.5.3.1 (3d ed.2002). A number of jurisdictions agree with Stone's position that intracorporate communications are not considered published under the law of defamation. *See, e.g., Starr*, 54 F.3d at 1553 (applying Oklahoma law); *Noel v. Andrus*, 810 F.2d 1388, 1393 (5th Cir.1987) (applying Louisiana law); *Halsell v. Kimberly–Clark Corp.*, 683 F.2d 285, 288–89 (8th Cir.1982) (applying Wisconsin law); *Agee v. Huggins*, 888 F.Supp. 1573, 1580 (N.D.Ga.1995) (applying Georgia law); *Keddie v. Pennsylvania State Univ.*, 412 F.Supp. 1264, 1277 (M.D.Pa.1976) (applying Pennsylvania law); *Williams v. A.L. Williams & Assocs., Inc.*, 555 So.2d 121, 124 (Ala.1989); *Lovelace v. Long John Silver's, Inc.*, 841 S.W.2d 682, 685 (W.D.Mo.Ct.App.1992); *M & R Inv. Co. v. Mandarino*, 103 Nev. 711, 748 P.2d 488, 491 (1987) (per curiam); *Woods v. Helmi*, 758 S.W.2d 219, 223 (Tenn.Ct.Ap. 1988); *Prins v. Holland–North Am. Mortgage Co.*, 107 Wash. 206, 181 P. 680, 680 (1919).

{9} The intracorporate communication exception derives from agency theory. Sack, *supra*, § 2.5.3.1. A corporation can act only through its agents or employees. Under agency theory, employees acting on behalf of the corporation are " 'not third persons vis-a-vis the corporation.' " *Hayes v. Wal–Mart Stores, Inc.*, 953 F.Supp. 1334, 1340 (M.D.Ala.1996) (applying Alabama law and describing special publication exception applicable to intracorporate communication) (quoting *Nelson v. Lapeyrouse Grain Corp.*, 534 So.2d 1085, 1093 (Ala.1988)); *see also* UJI 13–1003 (defining publication as communication to a party other than the one defamed). Accordingly, an intracorporate communication between employees or agents is not considered "published" because the corporation, in effect, is merely " 'communicating with itself.' " *Starr*, 54 F.3d at 1553 (quoting *Magnolia Petroleum Co. v. Davidson*, 194 Okla. 115, 148 P.2d 468, 471 (1944)).

{10} The exception finds some support in public policy. To make an informed decision, corporations need to communicate internally in a free and candid manner. The possibility of litigation may make employees less willing to come forward with truthful statements about sensitive corporate matters. A chilling effect on employee communication may impede a corporation's ability to investigate important subjects like alleged employee misconduct. As a result, the corporation may be less likely to take necessary corrective action, even if in the best interests of the corporation, its shareholders, and the public. *See, e.g., Lovelace,* 841 S.W.2d at 685 (stating that communication between the corporation and its personnel is necessary to the efficient running of a business and is the only means whereby a corporation can inform itself about employee conduct); *see also* Ruth A. Kennedy, *Insulating Sexual Harassment Grievance Procedures From the Chilling Effect of Defamation Litigation,* 69 Wash. L.Rev. 235, 236 (1994) (stating the need for a new "hybrid" grievance procedure privilege).

{11} On the other hand, a number of jurisdictions have rejected the intracorporate communication exception. *See, e.g., Jones v. Britt Airways, Inc.,* 622 F.Supp. 389, 391 (N.D.Ill.1985) (applying Illinois law); *Pirre v. Printing Devs., Inc.,* 468 F.Supp. 1028, 1041–42 (S.D.N.Y.1979) (applying New York law); *Kelly v. Gen. Tel. Co.,* 136 Cal.App.3d 278, 186 Cal.Rptr. 184, 186 (1982); *Torosyan v. Boehringer Ingelheim Pharm., Inc.,* 234 Conn. 1, 662 A.2d 89, 103 (1995) (per curiam); *Southern Bell Tel. & Tel. Co. v. Barnes,* 443 So.2d 1085, 1086 (Fla.Dist.Ct.App.1984); *Luttrell v. United Tel. Sys., Inc.,* 9 Kan. App.2d 620, 683 P.2d 1292, 1294 (1984); *Bander v. Metro. Life Ins. Co.,* 313 Mass. 337, 47 N.E.2d 595, 601 (Mass.1943); *Brantley v. Zantop Int'l Airlines, Inc.,* 617 F.Supp. 1032, 1034 (E.D.Mich.1985) (applying Michigan law); *Ramos v. Henry C. Beck Co.,* 711 S.W.2d 331, 335 (Tex.App.1986).

{12} Some of these jurisdictions acknowledge the need to protect corporations with regard to internal communications. They disagree, however, that corporations require what amounts to an absolute privilege barring all defamation lawsuits. They prefer, instead, a qualified privilege that precludes lawsuits if the defamatory statements are made in good faith. *See, e.g., Jones,* 622 F.Supp. at 391; *Kelly,* 186 Cal.Rptr. at 187; *Luttrell,* 683 P.2d at 1294. Courts that reject the absolute intracorporate communication exception treat the good faith privilege as a fact-dependent defense to defamation, rather than an absolute bar based on the theoretical impossibility of a corporation communicating with itself. *See* Draper, 47 A.L.R.4th, at 680; *see also Jones,* 622 F.Supp. at 391 (stating courts that recognize the intracorporate communication exception to publication "apparently confuse[ ] the issues of publication and privilege").

{13} Qualified privilege applies when a statement is made in good faith during the discharge of a public or private duty. UJI 13–1012 NMRA 2002 (itemizing circumstances leading to abuse of qualified privilege, such as when the speaker knew or should have known the statement was false or published for an improper purpose or beyond what was reasonably necessary); *Baker v. Bhajan,* 117 N.M. 278, 282, 871 P.2d 374, 378 (1994) (describing qualified privilege, which attaches to employer statements made for a proper purpose to one having a legitimate interest in the statements). *See generally* Restatement (Second) of Torts § 594 cmt. b (1977) (stating that conditional privileges strive to balance the interests of the defamed person, the publisher, third persons, and the public); Kennedy, 69 Wash. L.Rev., at 239 (describing how to overcome an abuse of the qualified privilege by showing that the defendant acted with malice or published the statement excessively). Qualified privilege allows the fact finder to "balance the competing interests at stake: shielding corporate officers when they act in good faith in furtherance of corporate goals, but withdrawing that protection if they use corporate power simply to serve their own, personal ends." *Ettenson v. Burke,* 2001–NMCA–003, ¶ 26, 130 N.M. 67, 17 P.3d 440 (discussing qualified privilege in the context of a tortious interference with contract claim) (citation omitted).

{14} Courts that reject the intracorporate communication exception conclude that a qualified privilege adequately protects the

corporation from unwarranted defamation liability, while at the same time affording some protection to vulnerable employee reputations. *Kelly*, 186 Cal.Rptr. at 187; *Jones*, 622 F.Supp. at 391. For example, the Kansas Court of Appeals stated that it saw "no reason for greater freedom from liability for defamation to be accorded the corporate employer than that already available to all employers through the qualified privilege." *Luttrell*, 683 P.2d at 1294 (observing that the employer who is evaluating or investigating an employee in good faith is protected from defamation lawsuits by the enhanced burden of proof required to show that the employer has abused its qualified privilege). *See generally* Kennedy, 69 Wash. L.Rev., at 244 (asserting that courts generally take a stringent approach to the malice standard, requiring that employees produce affirmative proof of malice); Kim S. Ruark, *Damned If You Do, Damned If You Don't? Employers' Challenges in Conducting Sexual Harassment Investigations*, 17 Ga. St. U.L.Rev. 575, 588–89 (2000) (stating that, when an employer asserts a qualified privilege, a defamation claim will ordinarily fail, unless the employee can prove that the employer acted with malice or published the statement to unrelated parties).

{15} This split among the authorities implies a policy choice. The absolute exception protects intracorporate communications from resulting litigation, but at a huge cost. False statements knowingly made, even malicious lies disseminated with devastating effect on one's reputation, are all protected on an equal plane with statements innocently made in the best interest of the corporation. Courts that apply the intracorporate communication exception "will not inquire into the issue of malice." Kennedy, 69 Wash. L.Rev., at 250 (stating that intracorporate immunity fails to adequately protect accused employees from reputation damage). Thus, one flaw in the intracorporate communication exception is that it can be overinclusive.

{16} The qualified privilege approach, on the other hand, recognizes that "damage to one's reputation within a corporate community may be just as devastating as that effected by defamation spread to the outside." *Lutt-*

*rell*, 683 P.2d at 1294; *accord* Kennedy, 69 Wash. L.Rev., at 241. Although corporate officers may be the embodiment of a corporation, they "remain individuals with distinct personalities and opinions, which opinions may be affected just as surely as those of other employees by the spread of injurious falsehoods. It is this evil that the law of defamation is designed to remedy." *Pirre*, 468 F.Supp. at 1041. As one federal court analogized, "if a truck negligently driven by a corporate employee ran over another employee or officer of the same corporation, no court would dismiss a claim against the corporate employer on the theory that the corporation had merely injured itself." *Id.* at 1042 n. 18; *see also Ettenson*, 2001–NMCA–003, ¶ 20, 130 N.M. 67, 17 P.3d 440 (stating that "we reject [the] view that corporate officers are simply surrogates of the corporation," in the context of discussing liability for tortious interference with contract). Thus, the qualified-privilege approach provides protection for victims of defamatory statements, but again there is a cost. The mere fact of ongoing litigation over the privilege—the fact-finding process of determining whether statements were made in good faith—may itself have a chilling effect on free expression. Thus, one flaw in the qualified-privilege approach is that it can be underinclusive.

{17} In arguing for an absolute privilege, Stone attempts to draw an analogy between the intracorporate communication exception and the absolute privilege for statements made in judicial and legislative proceedings. Although we appreciate that the offending statements were made while Stone was testifying at a formal grievance hearing, the argument does not persuade us. Traditionally, New Mexico courts have been very circumspect in recognizing absolute privilege. As we noted in *Baker*, "[t]he application of an absolute privilege is confined to very few situations in which there is an obvious policy in favor of complete freedom of expression regardless of the defendant's motives." 117 N.M. at 281, 871 P.2d at 377. We have largely confined recognition of absolute privilege to "statements in judicial and legislative proceedings, executive communications, communications between husband

and wife, political broadcasts, and consent of the plaintiff." *Id.* For example, we recently refused to recognize absolute immunity for corporate officers that interfere with the contracts of their own corporations, stating that "[a] qualified privilege is more attune with our own case law than a blanket provision of absolute immunity would be." *Ettenson,* 2001–NMCA–003, ¶ 20, 130 N.M. 67, 17 P.3d 440; *see also Davis v. Bd. of County Comm'rs,* 1999–NMCA–110, ¶ 29, 127 N.M. 785, 987 P.2d 1172 (explaining that recognition of qualified privilege to a defamation action reflects the policy of encouraging good faith disclosure by and concerning employees).

■ {18} Absolute privileges are "based chiefly upon a recognition of the necessity that certain persons, because of their special position or status, should be as free as possible from fear that their actions in that position might have an adverse affect upon their own personal interests." Restatement (Second) of Torts § 584 (comparing in introductory note that absolute privilege to conditional or qualified privilege). Corporate employees and agents do not enjoy such a "special position or status."

{19} Unlike speech involving public figures, which implicates the interests of the public and raises important constitutional issues, intracorporate speech primarily concerns private interests in corporate efficiency. *Compare Lovelace,* 841 S.W.2d at 685 (stating that intracorporate communication is necessary to the efficient running of a business), *with Andrews v. Stallings,* 119 N.M. 478, 483, 892 P.2d 611, 616 (Ct.App.1995) ("Where public figures are involved in issues of public concern, the Constitution contemplates a bias in favor of free speech."), *and Stover v. Journal Publ'g Co.,* 105 N.M. 291, 294–95, 731 P.2d 1335, 1338–39 (Ct.App.1985) (stating that the public's needs for information would suffer if the press faced possible civil liability for every falsity published); *New York Times Co. v. Sullivan,* 376 U.S. 254, 279–81, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) (requiring actual malice to support libel action by public official, so as not to inhibit freedom of speech regarding matters of public concern). When purely private interests are at stake, rather than issues of public concern, well-balanced policy considerations mitigate in favor of preserving some remedy for the individual injured in his reputation. Cavico, 24 Dayton L.Rev., at 407 (stating that "defamation law features a clash of important policy rationales, that is, the serious conflict between freedom of expression and the right to be free from baseless accusations harmful to one's reputation").

{20} The interest of the corporation in an absolute privilege is at least partially driven by economic factors, such as the cost of defending against defamation lawsuits or purchasing insurance to cover the cost of such lawsuits. *See generally* David Boies, *The Chilling Effect of Libel Defamation Costs: The Problem and Possible Solution,* 39 St. L.U. L.J. 1207 (1995) (discussing litigation costs in defending against defamation lawsuits). Although the lack of an absolute intracorporate communication exception may expose corporations to defamation liability, thereby affecting insurance rates and operating costs, that cost may properly be considered part of the price of accountability in a free and responsible society. "If effected in order to provide reasonable remedies for injuries we recognize for important policy reasons, the possibility of increased insurance costs furnishes no reasonable basis for denying injured persons a fair remedy." *Fernandez v. Walgreen Hastings Co.,* 1998–NMSC–039, ¶ 29, 126 N.M. 263, 968 P.2d 774 ("One of the animating forces behind our civil tort system of recovery is the social objective of spreading the loss."). "Our fault system of recovery ... serves the important social functions of redistributing the economic burden of loss from the injured individuals on whom it originally fell, deterring conduct that society regards as unreasonable or immoral, and providing a vehicle by which injured victims may obtain some degree of compensation...." *Trujillo v. City of Albuquerque,* 110 N.M. 621, 624, 798 P.2d 571, 574 (1990).

{21} We think it is of no small significance that the intracorporate communication exception has been rejected by the Restatement (Second) of Torts: "The communication within the scope of his employment by one agent to another agent of the same principal is a

publication not only by the first agent but also by the principal and this is true whether the principal is an individual, a partnership or a corporation." Restatement (Second) of Torts § 577 cmt. i (1977). Leading tort treatises take a similar view. *See generally* W. Page Keeton, Dan B. Dobbs, Robert E. Keeton & David G. Owen, *Prosser and Keeton on the Law of Torts* § 113, at 798 (5th ed.1984) (stating that there may be publication when a statement is made to a third party, even if the statement is made to the defendant's own agent, employee or officer, or even where the defendant is a corporation); 2 Fowler V. Harper, Fleming James, Jr., & Oscar S. Gray, *The Law of Torts* § 5.15 n. 21, at 124 (2d ed.1986) (acknowledging contrary authority, but asserting that the "prevailing view" is that communication within a corporation does constitute publication); *but see* Sack, *supra,* § 2.5.3.2 (arguing that intracorporate communication exception to publication should be recognized when the subject of the communication is not an employee). *See generally* Draper, 47 A.L.R.4th 674 (describing split in authority and analyzing policy rationale in support of, and in opposition to, intracorporate communication exception).

■ {22} In balancing competing policy interests, we conclude that the Restatement (Second) of Tort position is the better view. *See Schmitz v. Smentowski,* 109 N.M. 386, 396, 785 P.2d 726, 736 (1990) ("We have also been very willing to adopt the view of the Restatement of Torts to assist our development of new tort areas."). We decline to adopt the intracorporate communication exception as an absolute bar to a lawsuit for defamation. We side with the qualified-privilege approach that affords substantial protection to the corporation, while at the same time preserving defamation remedies for the worst kind of abuse that causes unprivileged injury to reputation. Accordingly, the district court erred when it granted summary judgment in favor of Stone based on the intracorporate communication exception.

### Prima Facie Tort

■ {23} The district court also granted summary judgment on the ground that Hagebak's prima facie tort claim is "based upon the same alleged conduct which forms the basis of his defamation cause of action." [RP 1161] Although Hagebak's affidavit alleged that Stone also disseminated misleading information about him months before the grievance hearing, the court struck Hagebak's affidavit for lack of personal knowledge. *See* Rule 1–056(E) NMRA 2002 (requiring that affidavits "shall be made on personal knowledge"). Hagebak does not appeal the district court's order striking his affidavit and appears to concede that both the defamation and prima facie tort claims arise out of Stone's statements at the grievance hearing. We must determine whether the district court erred in concluding that common facts, shared by Hagebak's two claims, preclude a prima facie tort claim as a matter of law.

■ {24} New Mexico first recognized a cause of action for prima facie tort in *Schmitz,* 109 N.M. 386, 785 P.2d 726. The elements of this tort are: (1) an intentional, lawful act by defendant; (2) an intent to injure the plaintiff; (3) injury to the plaintiff; and (4) insufficient justification for the defendant's acts. *Id.* at 394, 785 P.2d at 734. Prima facie tort is intended to provide a remedy for persons harmed by acts that are intentional and malicious, but otherwise lawful, which "fall outside of the rigid traditional intentional tort categories." *Id.* Prima facie tort should be used to address wrongs that otherwise "escape[ ] categorization," *id.* at 396, 785 P.2d at 736, but "should not be used to evade stringent requirements of other established doctrines of law," *id.* at 398, 785 P.2d at 738.

■ {25} Because not every intentionally caused harm gives rise to an actionable tort, we apply a balancing test to determine whether there is a cause of action under prima facie tort theory. *See Beavers v. Johnson Controls World Servs., Inc.,* 120 N.M. 343, 348, 901 P.2d 761, 766 (Ct.App. 1995) (applying fact-specific balancing test); *Schmitz,* 109 N.M. at 394–95, 785 P.2d at 734–35 (rejecting a more stylized definition of prima facie tort in favor of a flexible balancing approach). The activity complained of must be balanced against its justification and

the severity of the injury, weighing: (1) the injury; (2) the culpable character of the conduct; and (3) whether the conduct is unjustifiable under the circumstances. *Schmitz,* 109 N.M. at 394, 785 P.2d at 734; *see also* Restatement (Second) of Torts § 870 (1977) (describing balancing test to determine liability for intentional injury when an actor's conduct does not come within a traditional category of tort liability).

{26} New Mexico courts have also accepted the view that prima facie tort may be pleaded in the alternative. *See Schmitz,* 109 N.M. at 396, 785 P.2d at 736. However,

if at the close of the evidence, [a] plaintiff's proof is susceptible to submission under one of the accepted categories of tort, the action should be submitted to the jury on that cause and not under prima facie tort. Thus, double recovery may not be maintained, and the theory underlying prima facie tort—to provide [a] remedy for intentionally committed acts that do not fit within the contours of accepted torts-may be furthered, while remaining consistent with modern pleading practice.

*Id.* (citations omitted). While we agree that the shared facts that characterize Hagebak's claims for defamation and prima facie tort might preclude submitting both claims to the jury, we are not convinced that this circumstance made summary judgment appropriate as a matter of law.

{27} Although prima facie tort is not to become a " 'catch-all' alternative for every action that cannot stand on its own legs," this Court has, under certain circumstances, been willing to recognize a prima facie tort claim, even though the conduct in question bore a resemblance to another cause of action. *Beavers,* 120 N.M. at 348, 351–52, 901 P.2d at 766, 769–70 (affirming prima facie tort claim, although the defendant's conduct fell outside the perimeters of a claim for intentional infliction of emotional distress); Restatement (Second) of Torts § 870 cmt. j (1977) (describing the "form of the innominate tort" and stating that "[t]he new tort may be closely related to an established tort"). *But see Stock v. Grantham,* 1998–NMCA–081, ¶¶ 38–39, 125 N.M. 564, 964 P.2d 125 (holding that a prima facie tort claim may not be used

as a means of avoiding the more stringent requirements of the tort of intentional infliction of emotional distress, which requires extreme and outrageous conduct).

{28} Hagebak argues that although the factual bases of his claims overlap, these two claims are distinct. Hagebak contends that his prima facie tort claim "goes far beyond simple defamation[ ][and] amounts to deliberate injury, in furtherance of an illegal scheme, with injurious intent and injurious result." Essentially, Hagebak alleges that Stone was a co-conspirator in a massive fraud, and that she testified falsely against him as a means toward that end.

{29} Prima facie tort liability is determined through the application of a very fact-specific balancing process. *See, e.g., Beavers,* 120 N.M. at 348, 901 P.2d at 766. It would require further factual development to determine whether Hagebak's prima facie tort claim is merely duplicative of his defamation claim or is being used as a means to "evade stringent requirements of [another] established doctrine[ ] of law." *Fernandez–Wells v. Beauvais,* 1999–NMCA–071, ¶ 22, 127 N.M. 487, 983 P.2d 1006 (internal quotation marks and citations omitted); *see also Schmitz,* 109 N.M. at 396, 785 P.2d at 736 (providing that prima facie tort may be pleaded in the alternative). Consequently, it was error to award summary judgment against Hagebak on his claim for prima facie tort merely on the basis of the "same alleged conduct" between the two claims. Hagebak is entitled to a reasonable opportunity to marshall sufficient evidence to prove his case. Whether he can do so is another question, and the district court is free to revisit the viability of the prima facie tort claim at a future time.

**CONCLUSION**

{30} We reverse the entry of summary judgment against Hagebak and remand for further proceedings.

{31} **IT IS SO ORDERED.**

WE CONCUR: A. JOSEPH ALARID and RODERICK T. KENNEDY, Judges.