IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: 2012-NMSC-010

Filing Date: March 5, 2012

Docket No. 32,594

WALTER F. SMITH, III,

       Plaintiff-Appellant,

v.

WILL DURDEN, DENISE DURDEN,
WILLIAM A. DEVRIES, AND MARION DEVRIES,

       Defendants-Appellees.

APPEAL FROM THE SECOND JUDICIAL DISTRICT
Nan G. Nash, District Judge

William G. Gilstrap, P.C.
William G. Gilstrap
Albuquerque, New Mexico

Daymon B. Ely
Albuquerque, New Mexico

for Appellant

Butt, Thornton & Baehr, P.C.
Emily A. Franke
Jane A. Laflin
Albuquerque, New Mexico

for Appellees

Hal Simmons
Albuquerque, New Mexico

for Amici New Mexico Press Association and New Mexico Broadcasters Association

OPINION

**SERNA, Justice.**

**{1}**    Plaintiff Walter F. Smith, III, a former priest of St. Francis Episcopal Church in Rio Rancho, New Mexico, brought this defamation action against Will Durden and William DeVries, St. Francis Vestry members, and Denise Durden and Marion DeVries, members of the parish (Defendants).   The issue before the Court is whether New Mexico requires a showing of injury to one's reputation to establish liability for defamation.  We hold that it does, as injury to reputation is the very essence of the tort of defamation.  Evidence of humiliation and mental anguish, without evidence of actual injury to reputation, is insufficient to establish a cause of action for defamation.  We accordingly reverse the Court of Appeals.

## I.    BACKGROUND

**{2}**    Plaintiff initiated this defamation action in 2006 after the publication of a packet of documents which, among other things, alluded to alleged sexual misconduct involving Plaintiff and minor parishioners.  Defendant Will Durden had originally compiled the packet for a presentation before the Standing Committee of the Diocese of the Rio Grande by certain vestry members (lay leaders of the parish) who desired the removal of Plaintiff from his position.  The packet included documentation related to financial problems at St. Francis, an alleged lack of leadership shown by Plaintiff, and personal attacks against Plaintiff.  One of the documents was an anonymous letter accusing Plaintiff of several acts of pedophilia.  After the presentation before the Standing Committee, and at the recommendation of the Episcopal Bishop of the Diocese of the Rio Grande, Plaintiff disclosed a summary of the allegations to the congregation during a Sunday service.

**{3}**    At some point after Plaintiff's disclosure to the congregation, one or more of Defendants offered to make copies of the packet for inquiring parishioners.   Plaintiff subsequently filed this defamation claim.  Over a year after the filing of the complaint, Defendants moved for summary judgment on the ground that Plaintiff failed to establish a cause of action for defamation because he was unable to demonstrate that he had suffered any actual injury to his reputation as a result of the publication of the material by its distribution.  Plaintiff responded that falsely accusing a religious leader of pedophilia is always defamatory and that personal humiliation and mental anguish, as defined in the damages instruction for defamation claims (UJI 13-1010 NMRA), qualified as the requisite actual injury.  The district court granted Defendants' motion, finding that Plaintiff was unable to demonstrate actual injury to his reputation because he was never suspended from his position, nor did he suffer any "adverse employment consequences" or other related losses from distribution of the anonymous letter.  The district court also found that Plaintiff improperly looked to UJI 13-1010 as defining the requisite actual injury, without first establishing the prima facie case pursuant to UJI 13-1002 NMRA (1991) (amended 2008), which requires a showing of actual injury to reputation.  *See* UJI 13-1002(B)(8).

**{4}**    Plaintiff appealed the district court's grant of summary judgment in favor of

Defendants, and the New Mexico Court of Appeals reversed the district court, holding that UJI 13-1002(B)(8), the subsection requiring a plaintiff to prove actual injury to reputation as one element of the prima facie case for defamation, is an inaccurate statement of law because evidence of mental anguish and humiliation is sufficient to establish actual injury for liability purposes. *Smith v. Durden*, 2010-NMCA-097, ¶¶ 11-12, 15, 148 N.M. 679, 241 P.3d 1119. This appeal followed.

## II. STANDARD OF REVIEW

**{5}** We apply a de novo standard of review to the district court's granting of Defendants' motion for summary judgment. *See City of Rio Rancho v. AMREP Sw. Inc.*, 2011-NMSC-037, ¶ 14, 150 N.M. 428, 260 P.3d 414. Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Rule 1-056 NMRA. We view the facts in the light most favorable to the party opposing the summary judgment and indulge all reasonable inferences in favor of a trial on the merits. *See Romero v. Philip Morris Inc.*, 2010-NMSC-035, ¶ 7, 148 N.M. 713, 242 P.3d 280. The moving party "has the initial burden of establishing a prima facie case for summary judgment by presenting such evidence as is sufficient in law to raise a presumption of fact or establish the fact in question unless rebutted." *City of Rio Rancho*, 2011-NMSC-037, ¶ 14 (internal quotation marks and citation omitted). Once the moving party has made the prima facie case, "the burden shifts to the non-movant to demonstrate the existence of specific evidentiary facts which would require trial on the merits." *Id.* (internal quotation marks and citation omitted). Such facts are those which, under the guiding substantive law, are "necessary to give rise to a claim." *Id.* (internal quotation marks and citation omitted).

## III. DISCUSSION

**{6}** In order to gain insight into the jurisprudential development of defamation, we first briefly discuss the historical underpinnings of the tort. Defamation actions in England "developed according to no particular aim or plan." William L. Prosser, *Handbook of the Law of Torts* 737 (4th ed. 1971). Slander (oral communication) was historically proscribed in order to clear the slandered party's name and "protect the soul of the slanderer," while libel (written communication) was later "created primarily as a means of protecting government from the power of the printing press." David A. Anderson, *Reputation, Compensation and Proof*, 25 Wm. & Mary L. Rev. 747, 774 (1984); *see Afro-Am. Publ'g Co. v. Jaffe*, 366 F.2d 649, 659 (D.C. Cir. 1966) (en banc).

**{7}** In the early Middle Ages, "reputation was amply protected in England by the combined secular and spiritual authorities." Van Vechten Veeder, *The History and Theory of the Law of Defamation*, 3 Colum. L. Rev. 546, 546-47 (1903). Slander was at one time handled by manorial courts where the slanderer was required to vindicate the defamed party in front of those who heard the slanderous remarks. *See Afro-Am. Publ'g Co.*, 366 F.2d at 659; Veeder, *supra*, at 549. Slander later fell within the jurisdiction of ecclesiastical

3

courts—which viewed defamation as a sin punishable by penance. Prosser, *supra*, at 737. The ecclesiastical courts redressed slander by bringing the slanderer before clergymen to confess and apologize to the person defamed. *See Afro-Am. Publ'g Co.*, 366 F.2d at 659 n.26.

{8}     By the sixteenth century, common law courts began accepting slander actions, but only when temporal damages (damages related to business or money) could be shown, as without these damages slander remained the province of the church. Prosser, *supra*, at 754. In the seventeenth century, the concept of libel also emerged in common law courts as a way of suppressing and criminally punishing printed political attacks. *Id.* at 738; *see* Anderson, *supra*, at 774. Nonpolitical libel was also eventually recognized and made actionable in common law courts. *Id.* Unlike slander, libel was actionable without proving damages, which were presumed. *See Afro-Am. Publ'g Co.*, 366 F.2d at 659; Prosser, *supra*, at 762.

{9}     Following in these ancient footsteps, libel and slander are still commonly recognized and discussed as separate causes of action. Libel was established as a greater wrong, perhaps due to "the reverence of an illiterate nation for the printed word," Prosser, *supra*, at 751-52, or perhaps due to a perception that slanderous remarks are "often spoken in heat, upon sudden provocations, and are fleeting and soon forgotten." *Tonini v. Cevasco*, 46 P. 103, 104 (Cal. 1896) (internal quotation marks and citation omitted). Libel, on the other hand, was perceived as "more deliberate and more malicious, more capable of circulation in distant places . . . ." *Id.* These distinctions led not only to separate causes of action for libel and slander but also to the development of defamation as actionable per se or per quod. Defamation classified as "per se" historically has been actionable without proof of harm, as injury is presumed based on the nature of the communication. *Prosser and Keeton on the Law of Torts* 796 (W. Page Keeton et al. eds., 5th ed. 1984). Defamation classified as "per quod," on the other hand, is not defamatory on its face, and therefore extrinsic facts must be shown to prove its defamatory nature before recovery is allowed. *Id.*

{10}     As this Opinion will discuss, actions for defamation have evolved in many ways due to both the tort's maturing constitutional infrastructure and reform aimed to eliminate the unnecessary distinctions and nuances which linger from eras past. At a fundamental level, defamation has shifted away from the obsolete considerations discussed above to a focus that "serve[s] a more legitimate purpose—compensating individuals for injury to reputation." Anderson, *supra*, at 774. Courts have long recognized that "damage to reputation is, of course, the essence of libel." *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 275 (1971). Pursuant to its origins, however, defamation historically focused on the wrong rather than the injury, Anderson, *supra*, at 747, and injury to reputation was therefore typically a presumed harm, *see Newberry v. Allied Stores, Inc.*, 108 N.M. 424, 429, 773 P.2d 1231, 1236 (1989). Even where proof of special damages was required under the common law, presumed general damages for injury to reputation were recoverable once a showing of special damages had been made. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 372-73 (1974) (White, J., dissenting); *see also* Joel D. Eaton, *The American Law of Defamation Through Gertz v. Robert Welch, Inc. and Beyond:  An Analytical Primer*, 61 Va. L. Rev.

1349, 1437 (1975). This "theoretical underpinning"—that defamation law exists to provide redress for injury to reputation—was both recognized and maintained through the common law defamation action, although historically by presuming injury. *Id.*

## A.

**{11}** More recent fundamental changes to the tort have been shaped by First Amendment concerns, which have largely conflicted with former notions of presumed injury and damages. In *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), the United States Supreme Court for the first time recognized that defamation actions are subject to constitutional scrutiny in light of the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *Id.* at 270. *New York Times* established the actual malice standard of fault for public officials attempting to recover in defamation actions. *Id.* at 279-80, 283. In order to "free criticism of public officials from the restraints imposed by the common law of defamation," *New York Times* held that, in light of the importance of dialogue on issues of public concern, the Constitution requires more than mere reporting mistakes before a public official can recover damages for published falsehoods. *Gertz*, 418 U.S. at 334. This actual malice standard for defamation against public officials was later extended to public figures generally. *See Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 155 (1967).

**{12}** The United States Supreme Court struggled in the following years with whether and how *New York Times* should apply to private individuals. In *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 43-44 (1971), *abrogated by Gertz*, 418 U.S. at 347, the Court—in separate opinions each commanding three votes or less—extended the *New York Times* standard to defamation actions by private citizens in areas of public interest. However, three years later in *Gertz*, the Court retreated from *Rosenbloom* in light of the "strong and legitimate state interest in *compensating private individuals for injury to reputation*." *Gertz*, 418 U.S. 348-49 (emphasis added). *Gertz* held that, "so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of [a] defamatory falsehood injurious of a private individual." *Id.* at 347.

**{13}** After establishing the requirement of fault, *Gertz* turned to the issue of presumed injury in defamation actions and criticized defamation as "an oddity of tort law" because it allows for compensatory damages without proof of actual loss, thus permitting juries to "award substantial sums as compensation for supposed damage to reputation without any proof that such harm actually occurred," as well as permitting juries to "punish unpopular opinion rather than to compensate individuals for injury sustained by the publication of a false fact." *Id.* at 349.

**{14}** *Gertz* addressed these concerns by holding that "the States may not permit recovery of presumed or punitive damages, at least when liability is not based on a showing of knowledge of falsity or reckless disregard for the truth." *Id.* at 349. In discussing this

abolition of presumed damages, *Gertz* held that a state's interest in compensation for injury to reputation "extends no further than compensation for actual injury." *Id.* at 348-9. Recognizing that trial courts were experienced in crafting jury instructions for damages, *Gertz* simply clarified that actual injury is not limited to out-of-pocket losses, and that "more customary types of actual harm inflicted by defamatory falsehood include impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering." *Id.* at 349-50.

**{15}** The Supreme Court indicated in *Gertz* that only the state's interest in protecting an individual's *reputation* can justify the intrusion into otherwise constitutionally protected free speech. In the subsequent case of *Time, Inc. v. Firestone*, however, the Court narrowed *Gertz*'s emphasis on injury to reputation by providing that the states may permit recovery for injuries such as mental anguish without a showing of injury to reputation, and noting that by allowing the defamation plaintiff in *Firestone* to withdraw a claim for injury to reputation, leaving only a claim for mental anguish, "Florida has obviously decided to permit recovery for other injuries without regard to measuring the effect the falsehood may have had upon a plaintiff's reputation. This does not transform the action into something other than an action for defamation as that term is meant in *Gertz.*" *Firestone*, 424 U.S. 448, 460 (1976). In his dissenting opinion, Justice Brennan criticized the Court's retreat from the *Gertz* holding:

> It seems clear that by allowing this type of recovery the State has subverted whatever protective influence the actual injury stricture may possess. *Gertz* would, of course, allow for an award of damages for such injury after proof of injury to reputation. But to allow such damages without proof by competent evidence of any other actual injury is to do nothing less than return to the old rule of presumed damages supposedly outlawed by *Gertz* in instances where the *New York Times* standard is not met.

*Firestone*, 424 U.S. at 475 n.3 (Brennan, J., dissenting) (internal quotation marks and citation omitted). In the later case of *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749 (1985), a split Court further narrowed the *Gertz* requirement that a plaintiff prove actual injury by holding that *Gertz* is controlling only in defamation actions involving private plaintiffs and issues of public concern. In contrast, where defamation actions involve private plaintiffs and issues of purely private concern, the Constitution allows the states to "permit[] recovery of presumed and punitive damages in defamation cases absent a showing of 'actual malice.'" *Dun & Bradstreet*, 472 U.S. at 763.

**B.**

**{16}** In the wake of *New York Times* and subsequent Supreme Court cases, states were in some areas forced to reassess defamation law while in other areas given the discretion to do so. New Mexico began reworking state defamation law in response to these developments. *See Marchiondo v. N.M. State Tribune Co.*, 98 N.M. 282, 289, 648 P.2d 321, 328 (Ct. App.

1981) (*Marchiondo I*) ("The law of libel and slander has taken on a federal constitutional aspect in recent years which needs to be reviewed . . . before finalizing jury instructions. Basically, the entire law of libel and slander needs to be restudied in the light of the decisions of the United States Supreme Court since 1964." (alteration in original) (internal quotation marks and citation omitted)), *overruled on other grounds by Marchiondo v. Brown*, 98 N.M. 394, 649 P.2d 462 (1982).

**{17}**     In *Marchiondo v. Brown* (*Marchiondo II*), following the holding in *Gertz*, this Court ushered in many significant changes to our state defamation law.  These changes reflect New Mexico's movement toward a concept of defamation law that both minimizes unnecessary discrepancies and provides adequate safeguards against encroachment on constitutionally protected free speech.  *Marchiondo II* announced in pertinent part that strict liability was no longer applicable to defamation suits, the standard of fault in defamation cases involving private plaintiffs is ordinary negligence, defamation plaintiffs must plead and prove special damages, and punitive damages are recoverable only upon proof of actual malice.  98 N.M. at 402-03, 649 P.2d at 470-71.  *Marchiondo II* also recited the language in *Gertz* regarding the state's ability to fashion appropriate "actual injury" instructions, *see id.*, and concluded that the then-current Uniform Jury Instructions would need to be amended due to these numerous changes.  *See id.* at 403.

**{18}**     Further review of state law in the following years led to more change in the jurisprudence of the tort of defamation.  New Mexico abolished the distinctions between libel and slander.  *See Newberry*, 108 N.M. at 429, 773 P.2d at 1236 ("The lines of demarcation between slander . . . and libel . . . have become sufficiently blurred that we agree there are good reasons for abolishing the distinction between [them]." (third alteration in original) (quoting *Reed v. Melnick*, 81 N.M. 608, 612, 471 P.2d 178, 182 (1970), *overruled on other grounds by Marchiondo II*)); *see also* Eaton, *supra*, at 1434 (criticizing distinctions between libel and slander as "illogical distinctions, most of them relics from centuries past").

**{19}**     The common law distinctions between defamation per se and defamation per quod were also recognized as essentially obsolete in light of modern defamation jurisprudence.  *See Newberry*, 108 N.M. at 429, 773 P.2d at 1236.  This Court accordingly articulated that the appropriate question was no longer "whether the defamation is per se or per quod, but whether the plaintiff is a private or public figure."  *Id.*; *see Marchiondo II*, 98 N.M. at 399, 649 P.2d at 467; *see also* Committee Commentary to UJI 13-1002 ("Defamation spoken on national media has as much capacity for harm as a written statement published in a periodical of limited circulation.  Written defamation published to a huge audience many members of which are aware of the extrinsic facts making it defamatory probably is more harmful than 'per se' libel contained in a letter or other communication of limited circulation."); *see also* Dan B. Dobbs et al., 3 *The Law of Torts* § 574, at 336 (2nd ed. 2011) ("The presumed damages rule may be headed for extinction.  Commentators have attacked it and some states have abandoned it even when the Constitution does not require them to do so.").

**{20}** This Court, while acknowledging the United States Supreme Court's advisement in *Dun & Bradstreet* that states need not require private plaintiffs seeking punitive damages in defamation actions concerning private matters to prove actual malice, "decline[d] to follow *Dun & Bradstreet* on that issue." *Newberry*, 108 N.M. at 430, 773 P.2d at 1237. In line with this declination, and with efforts to rid state defamation jurisprudence of outmoded per se/per quod distinctions, we similarly decline to follow *Dun & Bradstreet* on the issue of permitting private plaintiffs in defamation actions concerning private matters to recover for presumed damages. *See Dun & Bradstreet*, 472 U.S. at 762-63 (stating that no credible argument favors special protection of a false and unfavorable credit report on a private person). Our current Uniform Jury Instructions, discussed below, follow this approach and require plaintiffs, irrespective of the plaintiff's and communication's classification as public or private, to prove actual injury to reputation and actual resulting damages.

**{21}** Numerous other courts have similarly declined to allow presumed damages in defamation cases. *See, e.g.*, *Arthaud v. Mut. of Omaha Ins. Co.*, 170 F.3d 860, 862 (8th Cir. 1999) (identifying historical allowance of defamation per se and noting that "Missouri courts [now] require a showing of actual damages in all defamation cases"); *United Ins. Co. of Am. v. Murphy*, 961 S.W.2d 752, 756 (Ark. 1998) (discussing *Dun & Bradstreet* and deciding to prohibit presumed damages in all defamation cases because "the better and more consistent rule . . . is to require plaintiffs to prove reputational injury in all cases"); *Walker v. Grand Cent. Sanitation, Inc.*, 634 A.2d 237, 243, 244 (Pa. Super. Ct. 1993) ("We [have] eviscerated the distinction between libel *per se* and libel *per quod* and held that [c]ourts in libel cases should be guided by the same general rules that govern other types of tort recovery. . . . Allowing the plaintiff to submit a claim for redress upon the presumption that she was damaged, especially in a case such as this, where the record is patently clear that no harm was suffered, requires the court to blindly follow a rule of law without regard to the reality of the situation presented. We cannot sanction, nor can we find that our Supreme Court has ever intended to sanction, such a rule." (second alteration in original) (internal quotation marks and citation omitted)).

## C.

**{22}** We now take the opportunity to further clarify the state of defamation law in New Mexico, and hold that actual injury to reputation must be shown as part of a plaintiff's prima facie case in order to establish liability for defamation. Although before now this Court had not explicitly considered the issue, we find ample support for this conclusion within the historical framework discussed above, this state's movement away from allowing recovery for any form of presumed harm, the manner in which the tort of defamation has generally been defined and discussed within our case law, and the wording and organization of our defamation jury instructions.

**{23}** In *Fikes v. Furst*, this Court's recent opinion analyzing elements of the defamation cause of action, we articulated that "[t]he primary basis of an action for libel or defamation is contained in the damage that results from the destruction of or harm to that most personal

and prized acquisition, one's reputation." 2003-NMSC-033, ¶ 12, 134 N.M. 602, 81 P.3d 545 (quoting *Gruschus v. Curtis Publ'g Co.*, 342 F.2d 775, 776 (10th Cir. 1965)). Although the analysis in *Fikes* centered on elements of the prima facie case other than the reputational injury element—namely whether the communication itself was defamatory and the recipient of the communication understood the communication to be defamatory (UJI 13-1002(B)(5)-(6)), this Court emphasized that "no matter how opprobrious a defendant's statement may be, a plaintiff is not entitled to recover damages unless he or she can show that it caused an injury to reputation." *Fikes*, 2003-NMSC-033, ¶ 12; *see also Hagebak v. Stone*, 2003-NMCA-007, ¶ 5, 133 N.M. 75, 61 P.3d 201 (stating that defamation is defined in New Mexico as "a wrongful and unprivileged injury to a person's reputation" (citing UJI 13-1001 NMRA)).

**{24}** As Justice Brennan articulated in *Firestone*, allowing recovery for injuries such as mental anguish before a showing of injury to reputation subverts the intended "protective influence" of the actual injury stricture. 424 U.S. at 475 n.3 (Brennan, J., dissenting); *see* Eaton, *supra*, at 1435 (indicating that "[i]f the tort of defamation is to retain its identity at all, proof of actual injury to reputation would seem to be a prerequisite to any award of out-of-pocket loss, and it seems more logical to require proof in that order, not in the reverse."); *see also* Anderson, *supra*, at 757-58 (suggesting that the actual injury requirement, as established in *Gertz* and interpreted in *Firestone*, may have sent "an invitation to the states to convert the tort of defamation from its common law purpose of protecting reputation into a new remedy for mental distress"); Gerald G. Ashdown, *Gertz and Firestone: A Study in Constitutional Policy-Making*, 61 Minn. L. Rev. 645, 670-72 (1977) (criticizing *Gertz* and *Firestone* for increasing, rather than decreasing, "the likelihood and potential magnitude of [gratuitous] compensatory awards" in defamation actions).

**{25}** New Mexico is far from alone in requiring reputational injury to be shown as a prerequisite to recovery. *See* Earl L. Kellett, Annotation, *Proof of Injury to Reputation as Prerequisite to Recovery of Damages in Defamation Action–Post Gertz Cases*, 36 A.L.R. 4th 807, § 2[b] (1985) (noting that after the issuance of *Firestone* "the various jurisdictions have split into two camps on the question whether injury to reputation must be shown"); *see, e.g.*, *Little Rock Newspapers, Inc. v. Dodrill*, 660 S.W. 2d 933, 935-36 (Ark. 1983) ("An action for defamation has always required this concept of reputational injury and recovery for mental suffering alone has not been allowed. . . . The spirit of the *Gertz* decision on this point is clearly one to protect First Amendment rights from unjustifiable and unsubstantiated intrusions. To allow recovery in a defamation action where the primary element of the cause of action is missing not only sets the law of defamation on end, but also substantially undercuts the impact *Gertz* seeks to effect."); *see also Zeran v. Diamond Broad., Inc.*, 203 F.3d 714, 719 (10th Cir. 2000) ("Although Plaintiff suffered an injury, the district court correctly found that Plaintiff did not suffer an injury to his reputation, which is the essence of an action for defamation." (discussing Oklahoma law)); *but see, e.g.*, *Firestone*, 424 U.S. at 460-61 (applying and discussing Florida law to conclude that Florida allows recovery without regard to injury to reputation); *Freeman v. Cooper*, 390 So. 2d 1355, 1360 (La. Ct. App. 1980) ("[M]ental suffering alone, or only injured feelings which must inevitably be

inferred from libelous statements, can be made the basis of a damage award.").

**{26}** Kansas, for example, has held that "damage to one's reputation is the essence and gravamen of an action for defamation. Unless injury to reputation is shown, plaintiff has not established a valid claim for defamation . . . . It is reputation which is defamed, reputation which is injured, reputation which is protected." *Gobin v. Globe Publ'g Co.*, 649 P.2d 1239, 1243 (Kan. 1982). Concerning damages, Kansas instructs that "[d]efamation is not concerned with the plaintiff's own humiliation, wrath or sorrow," except as an element of general damages recoverable as resulting from the underlying injury to reputation. *Id.* (quoting Prosser, *supra*, at 737); *see* Prosser, *supra*, at 761.

**{27}** As the dissent in the Court of Appeals Opinion below identified, our Uniform Jury Instructions follow a similar two-step approach. 2010-NMCA-097, ¶ 22 (Kennedy, J., dissenting). First, as a preliminary instruction, UJI 13-1001 defines the tort of defamation as a "wrongful injury to a person's reputation." UJI 13-1002 then sets forth the prima facie defamation case. One of the nine elements which must be established as part of the prima facie case is that "[t]he communication caused actual injury to the plaintiff's reputation." UJI 13-1002(B)(8). The Use Note for UJI 13-1002(B)(8) explains that "the requirement that plaintiff prove that the defamatory communication caused actual injury to plaintiff's reputation" is imposed because "New Mexico no longer allows presumed damages in defamation actions." This accurately reflects the fact that, because actual injury to reputation can no longer be presumed, the plaintiff has the burden to prove that the communication caused actual injury to reputation as part of the prima facie case.

**{28}** After the plaintiff has established a prima facie case for defamation pursuant to UJI 13-1002, the jury moves to the damages instruction, UJI 13-1010, and decides the amount of money necessary to fairly compensate for the injury caused by the defamatory communication. UJI 13-1010 instructs the jury, after "decid[ing] in favor of plaintiff on the question of liability," to fix the amount of money necessary to compensate the plaintiff for the underlying injury. The instruction lists several injuries which are likely to result from the communication of defamatory statements, including the injuries exemplified in *Gertz* such as personal humiliation and mental anguish and suffering. A plaintiff must prove that the defamatory communication caused one or more of these injuries in order for the jury to award damages. The Committee Commentary for UJI 13-1010 notes that the instruction was derived from *Marchiondo II*'s adoption of the language in *Gertz*.

**{29}** In response to the abandonment of presumed damages—namely for presumed injury to reputation—our prima facie defamation instruction requires a plaintiff to show actual injury to reputation in order to establish the defamation. *See* UJI 13-1002(B)(8). The requirement that a plaintiff in a defamation action prove actual injury to reputation is an accurate reflection of the law, as UJI 13-1002 comports with *Gertz*'s identification of the state interest in compensating private individuals for injury to reputation. Additionally, UJI 13-1010 aligns with *Gertz*'s requirement that compensation "extends no further than compensation for actual injury." 418 U.S. at 348-49. In line with the exemplified damages

10

in *Gertz*, which were later adopted in *Marchiondo II*, our damages instruction allows recovery for, among other injuries, personal humiliation and mental anguish.

**{30}** Cases such as *Fikes*, decided after modification of the jury instructions, have acknowledged the process of first establishing the cause of action, which includes proving actual injury to reputation, and then moving to the apportionment of damages necessary to compensate for that injury to reputation. 2003-NMSC-033, ¶ 12. *See Newberry*, 108 N.M. at 430, 773 P.2d at 1237 (identifying that, in addition to proving the other elements of the prima face case, a plaintiff must first prove the defendant "negligently published the communication, and that, the communication proximately caused actual injury to plaintiff's reputation," and then move on to prove "one or more of the following injuries . . ."); *see also Cowan v. Powell*, 115 N.M. 603, 604-05, 856 P.2d 251, 252-53 (Ct. App. 1993) (noting that UJI 13-1002 "require[s] Plaintiff only to prove that she suffered actual injury to her reputation as one of the elements of the cause of action," and that together, UJI 13-1002 and UJI 13-1010 "clearly establish a two-step process for reaching a verdict.")

**D.**

**{31}** We conclude that a plaintiff must first establish the prima facie case for defamation—which includes proof of actual injury to reputation—before a jury can award damages for mental anguish, humiliation, or any of the other recoverable harms listed in UJI 13-1010. Allowing recovery for such damages without first requiring proof of injury to reputation has been justifiably criticized, as under such an interpretation of defamation, "a plaintiff with a widespread reputation as a local hoodlum can keep that fact from the jury and recover for his mental anguish and person humiliation if he is negligently and falsely accused of scalping tickets at a football game." Eaton, *supra*, at 1439.

**{32}** Depending on the type and severity of facts presented in a given case, alternative tort recovery may more appropriately provide redress for a plaintiff truly seeking recovery for injuries other than injury to reputation. *See, e.g.*, *Moore v. Sun Publ'g Corp.*, 118 N.M. 375, 383, 881 P.2d 735, 743 (Ct. App. 1994) (identifying false light invasion of privacy as a "close cousin" to defamation which does not require evidence that the plaintiff was defamed); *Zeran*, 203 F.3d at 719 (distinguishing defamation from false light invasion of privacy by recognizing that in a defamation action "recovery is sought primarily for the injury to one's reputation, that is, what others may think of the person," while in a false light action, the "interest to be vindicated is the injury to the person's own feelings." (internal quotation marks and citation omitted)); Robert D. Sack, *Libel, Slander, and Related Problems* 561-62 (2nd ed. 1994) (identifying false-light tort as "designed to compensate for falsehoods that injure feelings rather than reputation."); *see also Kitchell v. Pub. Serv. Co. of N.M.*, 1998-NMSC-051, ¶ 15, 126 N. M. 525, 972 P.2d 344 (describing prima facie tort as providing "a remedy for acts committed with intent to injure the plaintiff and without justification" and articulating the tort's elements: "(1) an intentional and lawful act, (2) an intent to injure the plaintiff, (3) injury to the plaintiff as a result of the intentional act, and (4) the absence of justification for the injurious act."); *see generally* Anderson, *supra*, at 760

11

(identifying "several bodies of law that compensate persons for mental suffering. Most notable are the tort actions of assault and intentional infliction of emotional distress.").

**{33}**     We note that defamation law in New Mexico will not perfectly align with the Restatement (Second) of Torts (1977) in regard to requisite injury to reputation in defamation actions. The Restatement defines defamatory communication as that which "tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him," and specifies that "actual harm to reputation [is] not necessary to make [a] communication defamatory." *Id.* §§ 559A, 559 cmt. d. Although our Uniform Jury Instructions provide a similar definition of defamatory communication to assist the jury in determining whether the communication itself is even "capable of a defamatory meaning" in situations where the statement may not be readily recognized as defamatory (UJI 13-1007 NMRA Use Note), our instructions go on to require proof that the communication was both defamatory (UJI 13-1002(B)(5)) and caused actual injury to reputation (UJI 13-1002(B)(8)) for the establishment of liability. The Restatement, on the other hand, allows for the recovery of damages for certain defamatory communications without requiring further proof of actual injury to reputation or otherwise. *See* Restatement (Second) of Torts § 570 (identifying, as defamatory communications subject to liability, traditional per se categories imputing certain criminal offenses or "loathsome disease[s]," unfitness for work or office, or serious sexual misconduct). Taken together, these provisions suggest that the Restatement allows for recovery without requiring proof of actual injury to reputation under a recognition of defamation per se—a theory we view as outmoded by modern defamation jurisprudence. *See generally Poorbaugh v. Mullen*, 99 N.M. 11, 20, 653 P.2d 511, 520 (Ct. App. 1982); *Marchiondo II*, 98 N.M. at 402, 649 P.2d at 470.

**{34}**     In clarifying that New Mexico law requires plaintiffs to prove actual injury to reputation for recovery in all defamation cases, we acknowledge that "proof of actual damage will be impossible in a great many cases . . . ." *Dun & Bradstreet*, 472 U.S. at 760 (internal quotation marks and citation omitted). It is undoubtedly the case that "[a] system that restricts recovery to actual loss will be imperfect, but so is any system that attempts to compensate human injury with money." Anderson, *supra*, at 775. The interest served by allowing recovery for defamation, however, is the interest of compensating individuals for injury to reputation. *See Gertz*, 418 U.S. at 348-49. Recovery for a mere tendency to injure reputation, or only upon a showing of mental anguish, is not only too speculative where "the tort action for defamation has existed to redress injury to the plaintiff's reputation," *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 515 (1991), but it inappropriately blends defamation, a tort properly limited by constitutional protections, with other causes of action.

**{35}**     A showing of actual injury to reputation is not so high a barrier to surmount that it limits recovery only to monetary loss and employment termination, however. Injury to reputation may manifest itself in any number of ways. *See Gertz*, 418 U.S. at 349-50. Events indicating an injury to reputation in the present case might include a decline in membership at St. Francis, an unwillingness for parishioners to allow children to participate

in parish-related activities, or a decline in general social invitations from fellow parishioners—assuming such evidence could be proved and linked to the defamatory communication. There is no indication that Plaintiff came forward with evidence of any kind to support an argument that his reputation was actually injured by the publication of the anonymous letter.

**{36}** Because we acknowledge that the requirement to show actual injury to reputation may not have been sufficiently clear prior to this Opinion, however, we remand in order to allow Plaintiff the opportunity to amend his complaint to raise other theories for recovery which may more appropriately provide redress for the injuries he alleges to have suffered. In doing so we note that Plaintiff chose to base his request for relief on a single cause of action rather than pleading alternative plausible theories of recovery, an imprudent decision if, as here, that sole cause of action should prove untenable.

## IV.    CONCLUSION

**{37}** We hold that the Court of Appeals erred in reversing the district court's order granting summary judgment in favor of Defendants. The district court was correct in ruling that Plaintiff's failure to produce evidence of actual injury to reputation precludes his defamation claim as a matter of law. We remand to the district court for further proceedings consistent with this Opinion.

**{38}    IT IS SO ORDERED.**

 

 

                                            _____

                                            **PATRICIO M. SERNA, Justice**

**WE CONCUR:**

_____

**CHARLES W. DANIELS, Chief Justice**

_____

**PETRA JIMENEZ MAES, Justice**

_____

**RICHARD C. BOSSON, Justice**

_____

**SARAH M. SINGLETON, Judge**

**Topic Index for *Smith v. Durden*, Docket No. 32,594**

**CP    CIVIL PROCEDURE**

CP-SJ        Summary Judgment

**CT    CONSTITUTIONAL LAW**
CT-FS        Freedom of Speech
CT-FP        Freedom of Press

**TR    TORTS**
TR-DF        Defamation

**JI    JURY INSTRUCTIONS**
JI-CI        Civil Jury Instructions