2003-NMSC-033

81 P.3d 545

Jay Courtney FIKES, Ph.D.,
Plaintiff–Respondent,

v.

Peter T. FURST, Ph.D., Defendant–
Petitioner.

No. 27824.

Supreme Court of New Mexico.

Nov. 21, 2003.

Madison, Harbour, Mroz & Brennan, P.A., Michael W. Brennan, M. Eliza Stewart, Albuquerque, for Petitioner.

Overstreet & Associates, P.C., David Matthew Overstreet, James Nathan Overstreet, Alamogordo, for Respondent.

## OPINION

MINZNER, Justice.

{1} Petitioner Peter Furst, Ph.D. petitioned this Court to review an opinion of the Court of Appeals that reinstated some of the claims brought against him by Respondent Jay Fikes, Ph.D., but otherwise affirmed the district court's judgment for Dr. Furst. *See Fikes v. Furst*, 2003–NMCA–006, 133 N.M. 146, 61 P.3d 855. Dr. Fikes had brought this lawsuit against Dr. Furst in the district court for defamation, tortious interference with contract, and various other claims. The district court granted summary judgment in favor of Dr. Furst on all claims in three separate orders. Dr. Fikes appealed to the Court of Appeals regarding the defamation and tortious interference with contract claims only. *Id.* ¶ 5. The Court of Appeals affirmed the district court regarding most of the allegedly defamatory statements, but held that a sufficient question of fact remained regarding four of the statements to make summary judgment improper. The Court of Appeals also reversed the district court's dismissal of Dr. Fikes' tortious interference with contract claim. *Id.* ¶ 48. We hold that the district court properly granted summary judgment in favor of Dr. Furst on these claims; we therefore reverse the Court of Appeals in part, and remand to the district court for further proceedings consistent with entry of summary judgment in favor of Dr. Furst.

## I

{2} The parties to this case are two anthropologists involved in a decades-long dispute regarding each others' observations of the Huichol Indian community in Mexico. Dr. Furst, the defendant in the lawsuit and the petitioner to this Court, was the first to observe the religious practices of the Huichol Indians during the 1960s. Then, in the late 1970s and early 1980s, Dr. Fikes, the plaintiff in district court, the appellant in the Court of Appeals, and the respondent in this Court, visited the same Indian community. Dr. Fikes proceeded to dispute some of the findings that Dr. Furst had reported regarding Huichol practices.

{3} Dr. Furst took offense to Dr. Fikes' claims that his reports of Huichol practices were inaccurate, and thus began the bitter feud that resulted in this lawsuit. Each expressed his disagreement with the other in various ways. Dr. Furst allegedly made various disparaging remarks regarding Dr. Fikes to various third persons throughout the past fifteen years. As a representative sample, Dr. Furst made statements that Dr. Fikes was "a lousy anthropologist," "beset by devils," and was "pursuing a half-assed fantasy." Dr. Fikes, for his part, wrote a book that chronicled his disagreement with Dr. Furst's conclusions about the Huichol that was entitled *Carlos Castaneda: Academic Opportunism and the Psychedelic Sixties.* The manuscript contained statements, referring to Dr. Furst's work with the Huichol Indians, such as, "I discovered what may be the most complicated and fascinating anthropological hoax of the 20th century." Originally, Dr. Fikes entered into a contract with Madison Books to publish the manuscript. However, Dr. Furst found out about it, and wrote to the publisher threatening to sue for libel if the book was published. Madison Books then canceled the contract with Dr. Fikes to publish the book. Subsequently, Dr. Fikes' manuscript was modified to, in his words, "libel-proof" its content, and another publisher, Millenia Press, was found for the book.

{4} Despite his claims that he might, Dr. Furst never sued Dr. Fikes for libel as a result of the published book. Dr. Fikes,

however, sued Dr. Furst for defamation, tortious interference with contract, and other claims in 1996. The district court granted summary judgment in favor of Dr. Furst in 1998. Dr. Fikes appealed to the Court of Appeals regarding the defamation and tortious interference with contract claims. The Court of Appeals affirmed summary judgment on many of the defamation claims, either because they were barred by the statute of limitations, or because the alleged statements involved opinions rather than facts. *See generally Fikes*, 2003–NMCA–006, 133 N.M. 146, 61 P.3d 855.

{5} The Court of Appeals reversed the district court's order, however, regarding two groups of alleged defamatory statements. The first group of statements were made by Dr. Furst to Dr. Bruce Bernstein, the chief Curator and Assistant Director of the Museum of New Mexico. In a deposition, Dr. Bernstein testified that Dr. Furst, "on more than one occasion went through a litany of reasons why Dr. Fikes was unqualified" to work on a "Huichol Indian Assistance Project" that was envisioned at the University of New Mexico. That project was eventually abandoned. The second group of statements made by Dr. Furst all related to Dr. Fikes' relationship with the University of Michigan. Specifically, Dr. Furst asserted that the university "disowned" Dr. Fikes, "[d]idn't want anything to do with him," and was "sorry they had ever given him or provided him with a doctor's degree." These statements were made by Dr. Furst to Dr. Bernstein. A similar statement was made to Joan O'Donnell of the School of American Research.

{6} The Court of Appeals also reversed the order granting summary judgment in favor of Dr. Furst regarding the tortious interference with contract claim. The Court held that an issue of fact existed: whether Dr. Furst's threat to sue the publisher was made with an improper motive. The Court explained that the record contained evidence that supported an inference that Dr. Furst did not actually intend to sue the publisher, because he did not sue Millenia Press after the revised manuscript was eventually published.

{7} Dr. Furst petitioned this Court for certiorari. Dr. Fikes did not cross-petition.

## II

{8} As a preliminary matter, we must explain the proper scope of our review of the Court of Appeals opinion. Dr. Fikes, in his answer brief, asserts that this Court should take this opportunity to review other allegedly defamatory statements on which the Court of Appeals affirmed summary judgment in favor of Dr. Furst. Dr. Fikes, however, did not file a petition for certiorari regarding the numerous claims that the Court of Appeals held were properly dismissed by the district court. Under the appellate rules, it is improper for this Court to consider any questions except those set forth in the petition for certiorari. *See* Rule 12–502(C)(2) NMRA 2003. Accordingly, Dr. Furst has not responded in his reply brief to the merits of Dr. Fikes' arguments regarding claims outside of the scope of the petition; he emphasizes instead that those issues are not properly before this Court. We agree.

{9} This Court cannot consider any of Dr. Fikes' claims that the Court of Appeals erred. Dr. Fikes could have filed a cross-appeal or petition for certiorari as to those issues. Not having done so, he has waived any right to request their review. *Id.; see* 5 C.J.S. *Appeal & Error* § 840 (1993) ("[T]he higher court cannot review rulings of the intermediate court against appellee where appellant alone appealed or applied for a writ of error."). The United States Supreme Court similarly requires a cross-petition for certiorari if the respondent wishes to argue additional issues. *See, e.g., Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 360, 122 S.Ct. 1497, 152 L.Ed.2d 563 (2002) ("Petitioners challenged only the Court of Appeals' constitutional holding in their petition for certiorari, and respondents did not file a cross-petition. We therefore address only the constitutional question ....."). If we were to acquiesce in this request to consider any issue addressed by the Court of Appeals, we would work a substantial change on the certiorari process. This would be unfair to the petitioner and inconsistent with our appellate rules. We thus

limit our discussion to those issues raised in the petition for certiorari.

## III

{10} Dr. Furst asserts that the Court of Appeals erred by reversing the district court's order and reinstating Dr. Fikes' claims regarding some of the defamatory statements. Dr. Furst argues that two different elements of a defamation case have not been met. First, he claims that the recipients of the allegedly defamatory statements did not attribute defamatory meaning to the statements. Second, he argues that Dr. Fikes has not alleged any specific damages that resulted from the statements. We need not reach the damages issue because we agree with Dr. Furst that the recipients did not attribute a defamatory meaning to the statements.

### A

{11} Because the district court granted summary judgment in favor of Dr. Furst, we apply a de novo standard of review. *McGarry v. Scott*, 2003–NMSC–016, ¶ 5, 134 N.M. 32, 72 P.3d 608. Summary judgment is the appropriate disposition if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Rule 1–056(C) NMRA 2003. "Summary judgment may be proper even though some disputed issues remain, if there are sufficient undisputed facts to support a judgment and the disputed facts relate to immaterial issues." *Oschwald v. Christie*, 95 N.M. 251, 253, 620 P.2d 1276, 1278 (1980). Once the movant makes a prima facie case that summary judgment should be granted, the burden "shifts to the opponent to show at least a reasonable doubt, rather than a slight doubt, as to the existence of a genuine issue of fact." *Ciup v. Chevron U.S.A., Inc.*, 1996–NMSC–062, ¶ 7, 122 N.M. 537, 928 P.2d 263.

### B

{12} "The primary basis of an action for libel or defamation is contained in the damage that results from the destruction of or harm to that most personal and prized

acquisition, one's reputation." *Gruschus v. Curtis Publishing Co.*, 342 F.2d 775, 776 (10th Cir.1965). Thus, no matter how opprobrious a defendant's statement may be, a plaintiff is not entitled to recover damages unless he or she can show that it caused an injury to reputation. Under the framework of our Uniform Jury Instructions, the tort of defamation has nine elements. *See* UJI 13–1002(B) NMRA 2003. Two of the elements that the plaintiff must prove are that the communication at issue is defamatory, and the recipient of the communication understands it to be defamatory. *Id.* These elements raise a common question: What does it mean for a statement to be defamatory? "Generally, a statement is considered defamatory if it has a tendency to render the party about whom it is published contemptible or ridiculous in public estimation, or expose him [or her] to public hatred or contempt, or hinder virtuous [people] from associating with him [or her]." *Bookout v. Griffin*, 97 N.M. 336, 339, 639 P.2d 1190, 1193 (1982).

{13} Dr. Furst does not argue that the statements he made about Dr. Fikes could not be interpreted to have a defamatory meaning. Indeed, the statements that Dr. Fikes was unqualified to work on a Huichol Indian assistance project, and the various statements regarding his relationship with the University of Michigan, might be considered defamatory as a matter of law. *See Newberry v. Allied Stores, Inc.*, 108 N.M. 424, 429, 773 P.2d 1231, 1236 (1989) ("A statement is deemed to be defamatory per se, if, without reference to extrinsic evidence and viewed in its plain and obvious meaning, the statement imputes to plaintiff: ... unfitness to perform duties of office or employment for profit, or the want of integrity in discharge of the duties of such office or employment[, or] some falsity which prejudices plaintiff in his or her profession or trade ...."). Rather, Dr. Furst argues that Dr. Bernstein and Ms. O'Donnell did not attribute a defamatory meaning to the statements, notwithstanding the ordinary meaning of the words Dr. Furst used.

{14} This Court has not considered what it means for the recipient to understand a statement to be defamatory. Our Uniform

Jury Instruction is based on the definition found in 3 Restatement (Second) of Torts § 563 (1977). Although the Restatement is not binding, we consider it to be "persuasive authority entitled to great weight." *Gabaldon v. Erisa Mortgage Co.*, 1999–NMSC–039, ¶ 27, 128 N.M. 84, 990 P.2d 197. Thus, we note that the Uniform Jury Instruction states:

> To support a claim for defamation, the defamatory meaning of the communication must be understood by the person to whom it was communicated.

> The defamatory meaning of a communication is that which the recipient reasonably understands it was intended to express. It is what the recipient of the communication reasonably understood the meaning to be that controls; not what the defendant may have intended to convey.

UJI 13–1008 NMRA 2003.

{15} Some statements that may seem plainly defamatory to an outside observer may be understood by the intended recipient in a completely different way. *See* Restatement, *supra*, § 563 cmt. e at 164 ("Words which if isolated from the circumstances under which they were uttered might appear defamatory, may in fact not have been so understood by the person to whom they were published."). "Communications are judged on the basis of the impact that they will probably have on those who are likely to receive them, not necessarily the ordinary 'reasonable man.'" Robert D. Sack, *Sack on Defamation* § 2.4.3, at 2–25 (3rd ed.2003). Dr. Furst is not liable in tort for defamation if the recipients of his words did not understand those words to have a defamatory meaning. "[C]ontext (including tone and type of publication) may show that language is asserting no defamatory fact because context can show that the words should not be understood as literal statements but as whimsy, irony, hyperbole, or meaningless invective." Dan B. Dobbs, *The Law of Torts* § 404, at 1133 (West 2000); *see Morse v. Ripken*, 707 So.2d 921, 922 (Fla.Dist.Ct.App. 1998) (holding that the court must consider all of the circumstances surrounding the statement, including the audience to which it is published, before determining that the statement is indeed defamatory).

{16} The Court of Appeals held that disbelief by the recipients would not defeat the claim. *See Fikes*, 2003–NMCA–006, ¶ 21, 133 N.M. 146, 61 P.3d 855. We believe Defendant's argument differs subtly from the Court of Appeals' characterization. Dr. Furst does not argue that he should not be liable because the recipients did not believe his statements. Rather, he argues the recipients thought that he was trying to convey something different than the ordinary meaning of his words. In another context, the argument that the recipients did not really think that Dr. Furst meant to say that Dr. Fikes was unqualified, or that the University of Michigan disapproved of him, might not be plausible because it would lack support in the record. In this case, however, the deposition testimony provides confirmation. Dr. Bernstein, the recipient of some of the statements made by Dr. Furst, first stated that the statements did not influence his opinion of Dr. Fikes. Dr. Bernstein explained that Dr. Furst's statements were typical of what he hears in the anthropological community. He went on, however, to state that the statements caused him to have "a much more cautious approach" in his dealings with both Dr. Fikes and Dr. Furst. Ms. O'Donnell, when asked about her reaction to Dr. Furst's statements, stated that "I would say some of [the statements] are extreme but they are not outside the range of what goes on in academic talk."

{17} At oral argument, Dr. Furst's counsel contended that such statements are common within the academic community of which his client and Dr. Fikes are part and because they are common, do not convey, or at least in this case did not convey, a defamatory meaning. If the recipients of the statements had expressly indicated that in the academic community of which Dr. Furst and Dr. Fikes were part such statements would not be taken literally, the issue on appeal would have been easier. Nevertheless, we are persuaded the deposition testimony supports an inference that the statements were not taken literally by the recipients, because similar statements usually are not taken literally in

the context in which they were made. Rather, such statements were understood by the recipients to be Dr. Furst's opinions and not actual facts. While Dr. Furst may have intended for the recipients to draw negative inferences of Dr. Fikes from his statements, this intent alone does not give defamatory meaning to the statements. *See Moore v. Sun Publ'g Corp.*, 118 N.M. 375, 381–82, 881 P.2d 735, 741–42 (Ct.App.1994) (distinguishing statements of opinion that go beyond essential facts and "convey a negative opinion" from statements that "imply a 'provably false factual assertion' ").

{18} In addition to the immediate context of the statement, we also look to "the broader social context into which the statement fits." *Ollman v. Evans*, 750 F.2d 970, 983 (D.C.Cir.1984). Criticism of the work of scholars is generally commonplace and acceptable in academic circles. Thus, statements that may appear in isolation to be defamatory may in fact be particularly appropriate or acceptable criticism when made in an academic setting. *See, e.g., Freyd v. Whitfield*, 972 F.Supp. 940, 946 (D.Md. 1997) (holding statements non-defamatory in part because they were made within "the broader social contact of an academic lecture"). *Cf. Ezrailson v. Rohrich*, 65 S.W.3d 373, 382 (Tex.App.2001) ("[C]riticism of the creative research ideas of other medical scientists should not be restrained by fear of a defamation claim...."). This is so because an academic audience will often be able to recognize the "subjective character" of the statements and "discount them accordingly." *Freyd*, 972 F.Supp. at 946. Not only should this sort of "imaginative expression" not be discouraged by defamation claims, it is often valuable to discourse and at times should be encouraged. *See Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990) (noting that protecting statements that cannot reasonably be interpreted as stating actual facts "provides assurance that public debate will not suffer for lack of 'imaginative expression' or the 'rhetorical hyperbole' which has traditionally added much to the discourse of our Nation").

{19} Considering the context of the statements made by Dr. Furst, the evidence produced in support of his motion for summary judgment supports Dr. Furst's argument. He made a prima facie showing that the recipients did not attribute a defamatory meaning to the statements he made. Because proof that a defamatory communication occurred was essential to Dr. Fikes' case, Dr. Furst's showing gave rise to a burden on Dr. Fikes to show that there was an issue of fact concerning a statement of defamatory meaning. Dr. Fikes did not carry that burden. He has not pointed to any evidence that the statements affected the recipients' opinions of him, other than Dr. Bernstein's statement that he now takes "a much more cautious approach" in his professional dealings with Dr. Fikes and Dr. Furst. We construe this statement as evidence that Dr. Bernstein did not want to get in the middle of the feud, not that he no longer respected Dr. Fikes professionally. We conclude the deposition testimony supports an inference, which Dr. Fikes did not rebut, that neither recipient understood the words to have a defamatory meaning. Because neither recipient of the statements attributed a defamatory meaning to them, we must affirm the district court's order granting summary judgment in favor of Dr. Furst as to these claims.

## IV

{20} Dr. Furst also argues that the Court of Appeals erred by reversing the district court's order dismissing the tortious interference with contract claim. In order to prevail on a claim of tortious interference with contract, Dr. Fikes must prove that Dr. Furst took action that persuaded Madison Books to break its commitment to publish his manuscript, and that Dr. Furst accomplished this either with an improper motive or through improper means. *Kelly v. St. Vincent Hosp.*, 102 N.M. 201, 207, 692 P.2d 1350, 1356 (Ct.App.1984). The Court of Appeals held that an issue of material fact remains regarding whether Dr. Furst had an improper motive or used improper means for threatening Madison Books with litigation. *See Fikes*, 2003–NMCA–006, ¶¶ 45–47, 133 N.M. 146, 61 P.3d 855.

## A

{21} Dr. Furst argues that for an "improper motive" to exist the motive must have been *solely* to harm the plaintiff. This Court, though, has never stated that an improper motive must be the sole motive for interfering with an existing contract. We have only applied the "sole motive" test to prospective contracts, and at-will contracts, which are equivalent to prospective contracts. *See Silverman v. Progressive Broad., Inc.,* 1998–NMCA–107, ¶ 28, 125 N.M. 500, 964 P.2d 61 (stating that a claim for prospective interference with contract requires a showing that the sole motive was to harm the plaintiff); *Kelly,* 102 N.M. at 207, 692 P.2d at 1356 (stating that the Court will apply the means and motive analysis applicable to prospective contracts to an at-will contract); *Clough v. Adventist Health Sys., Inc.,* 108 N.M. 801, 806, 780 P.2d 627, 632 (1989) (applying sole motive analysis to interference with a doctor's relationship with patients). Nevertheless, the Court of Appeals accepted the "sole motive" test as the applicable standard below. *See Fikes,* 2003–NMCA–006, ¶ 45, 133 N.M. 146, 61 P.3d 855. We believe a different standard was appropriate, but we also believe that on the record Dr. Furst was entitled to summary judgment on this claim as well as the defamation claims.

{22} When the interest at stake is an existing contractual relationship, a different analysis is appropriate than when the interest at stake is a prospective contractual relationship.

American courts are not as willing to protect interests in prospective contractual relations as they are to protect interests in existing contracts. Where the defendant is accused of interfering with the plaintiff's opportunity to enter into contracts with third persons, a strong showing must be made that the defendant acted not from a profit motive but from some other motive, such as personal vengeance or spite.

*Anderson v. Dairyland Ins. Co.,* 97 N.M. 155, 158, 637 P.2d 837, 840 (1981) (quoting James A. Henderson, Jr. & Richard N. Pearson, *The Torts Process* 1166 (2d ed.1981)). The Restatement recognizes that "greater protection is given to the interest in an exist-ing contract than to the interest in acquiring prospective contractual relations." 4 Restatement, *supra,* § 767 cmt. j, at 37. Thus, for a claim based on an interference with an existing contract, the plaintiff must still prove that the defendant acted with either an improper motive or improper means, but the improper motive need not be the sole motive. *Id.* cmt. d, at 32 ("The desire to interfere with the other's contractual relations need not, however, be the sole motive."). *See also* 2 Fowler Harper et al., *The Law of Torts* § 6.11, at 341 (2d ed. 1986) ("[T]he law does not extend its protection as far in the case of precontractual interferences as it does when existing contracts have been interfered with.").

{23} In *Speer v. Cimosz,* 97 N.M. 602, 606, 642 P.2d 205, 209 (Ct.App. 1982), the Court of Appeals explained that "'[p]rivilege' [is] defined as a good faith assertion or threat by the one interfering to protect a legally-protected interest of his [or her] own which he [or she] believes might otherwise be impaired or destroyed by performance of the contract." A motive to protect one's own interest does not need to be the exclusive motive for the conduct to be privileged. *See Williams v. Ashcraft,* 72 N.M. 120, 122, 381 P.2d 55, 56–57 (1963) ("'[O]ne acting to protect his [or her] property rights is privileged to interfere even if he does so with malice.' ... 'As a general rule, justification for interfering with the business relations of another exists where the actor's motive for doing so is to benefit himself [or herself], and it does not exist where his [or her] sole motive is to cause harm to such person.'") (quoted authorities omitted). This rule is in keeping with the Restatement formulation that more conduct will be privileged for interference with prospective contracts than will be privileged for interference with existing contracts. A person may be privileged to interfere with a prospective contract unless the sole motive is to harm a third party; in contrast, a person may not be privileged to interfere with an existing contract, even if the person has mixed motives. The inquiry, in the end, should be to determine the party's primary motivation for the interference. If it was primarily improper,

then the person has no privilege. If it was primarily proper, then liability should not attach.

{24} In this case, Dr. Fikes and Madison Books had an existing contract to publish his book. Therefore a sole motive analysis is not applicable. Regardless of whether Dr. Furst intended him harm, Dr. Fikes still needed to show that Dr. Furst was not substantially motivated by a desire to protect his own interest. It cannot be questioned that Dr. Furst sought to protect his own legally protected interest by sending his letter to Madison Books. In his letter to the publisher, Dr. Furst claimed that the book would "threaten serious damage to ... [his] standing in the anthropological community, [his] ongoing career, and, not least, [his] livelihood." This statement clearly demonstrates that Dr. Furst was motivated by more than a desire to harm Dr. Fikes when he sent the letter. He wanted to protect his own reputation. Nowhere in the letter is there any indication that Dr. Furst had an improper motive for making his request. Dr. Fikes does not point to any other evidence in the record that would indicate such an improper motive, but rather he contends that "Dr. Furst's animosity toward [him] is self evident." We are left to conjecture and speculation in that regard. While it would not be surprising to discover that Dr. Furst took pleasure in Dr. Fikes' lost profits, given the history of their contentious relationship, the letter reflects far more than personal animosity; it reflects Dr. Furst's genuine concern for his professional reputation and livelihood. It was Dr. Fikes' burden to present evidence to the contrary in his response to Dr. Furst's motion for summary judgment. Dr. Fikes not having done so, the district court properly entered summary judgment in favor of Dr. Furst on this claim.

### B

{25} Dr. Fikes also argues that Dr. Furst utilized "improper means" to interfere with his publishing contract with Madison Books. In *M & M Rental Tools, Inc. v. Milchem, Inc.*, 94 N.M. 449, 454, 612 P.2d 241, 246 (Ct.App.1980) (quotation marks and quoted authority omitted), the Court of Appeals stated, "[c]ommonly included among improper means are violence, threats or other intimidation, deceit or misrepresentation, bribery, unfounded litigation, defamation, or disparaging falsehood." Dr. Fikes claims that Dr. Furst's letter to Madison Books constituted a threat of unfounded litigation. He argues that the fact that Dr. Furst did not sue once a different version was finally published by another publisher demonstrates that Dr. Furst never intended to sue, but simply to harass. This contention lacks support because the content of Dr. Fikes' book appears to have been changed specifically for the purpose of making it "libel-proof" before it was published by the Millenia Press. Furthermore, the content of the book that was published is not in the record. Therefore, Dr. Furst's decision not to sue for libel as a result of the publication of the second book is completely unprobative of whether he would have sued if the first manuscript had been published. Dr. Fikes points to no evidence in the record that would create a genuine issue of material fact as to whether Dr. Furst acted with improper means.

### V

{26} We hold that the Court of Appeals erred to the extent that it reversed the district court's order granting summary judgment in favor of Dr. Furst. On the defamation claims, there was no genuine issue of material fact that the recipients of the statements understood them to be defamatory. On the claim for tortious interference with contract, there was no genuine issue of material fact that Dr. Furst was substantially motivated by a desire to protect his own interests. Thus, the district court correctly held that Dr. Furst was entitled to judgment as a matter of law. We therefore affirm the district court's summary judgment for Dr. Furst.

{27} **IT IS SO ORDERED.**

MAES, C.J., SERNA, J., BOSSON and CHAVEZ, JJ., concur.