# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: 2012-NMSC-020

Filing Date: June 14, 2012

Docket No. 32,756

LENSCRAFTERS, INC., an Ohio corporation,

     Plaintiff-Respondent,

v.

DENNIS KEHOE, O.D.,

     Defendant-Petitioner.

**ORIGINAL PROCEEDING ON CERTIORARI**
**Richard J. Knowles, District Judge**

Law & Resource Planning Associates, P.C.
Charles Thomas DuMars
Tanya L. Scott
Stephen Curtice
Albuquerque, NM

for Petitioner

Montgomery & Andrews, P.A.
Randy S. Bartell
Santa Fe, NM

Schmidt & Copeland, LLC
John E. Schmidt, III
Melissa J. Copeland
Columbia, SC

for Respondent

## OPINION

**DANIELS, Justice.**

**{1}** We granted certiorari to review a Memorandum Opinion of the Court of Appeals and to address four issues stemming from a lawsuit by LensCrafters to enforce a noncompete provision against optometrist Dennis Kehoe after a sublease contract between the two parties ended. Having reviewed the record in this complex, convoluted, and contentious eleven-year dispute, we hold that (1) the district court properly dismissed LensCrafters' breach of contract claim on summary judgment because LensCrafters terminated the parties' contract as a matter of law and, with it, the contract's noncompete provision; (2) the district court did not abuse its discretion when it denied Kehoe's request to supplement his pleadings shortly before trial; and (3) summary judgment dismissing Kehoe's malicious abuse of process and tortious interference with contract counterclaims was proper because Kehoe did not demonstrate genuine issues of material fact. Because we hold that the noncompete provision was not in effect during any relevant time, we do not need to address Kehoe's fourth issue, whether the provision would have been contrary to public policy. Accordingly, we affirm the Memorandum Opinion of the Court of Appeals in part and reverse in part.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

**{2}** From 1997 to 2001, Kehoe subleased space for his optometry practice from LensCrafters next to that company's Winrock Center eyeglass-dispensing store in Albuquerque. A series of LensCrafters-prepared contracts governed the sublease: an original one-year contract that took effect in September 1997; a second one-year contract that took effect in 1998; and a third one-year contract that took effect in 1999, which, in 2000, the parties renewed and extended until September 30, 2001. Each of these contracts included a noncompete provision that restricted Kehoe from opening another optometry practice within a certain time frame and distance of LensCrafters' Winrock store should Kehoe either default on his contractual obligations or elect not to accept an offer by LensCrafters to renew the existing contract; the noncompete provision was not applicable if LensCrafters elected not to renew an existing contract.

**{3}** On May 29, 2001, more than 120 days before the parties' third and final contract was set to expire, LensCrafters sent Kehoe a letter stating that it was to serve as notice of nonrenewal of the parties' then-existing 1999 contract (nonrenewal letter). The nonrenewal letter instructed Kehoe to sign an acknowledgment that the parties' current contract was terminated, and it enclosed a proposed new sublease contract that Kehoe was asked to sign if he wished to continue subleasing space from LensCrafters through the new contract after September 30, 2001. Kehoe did not sign either the termination acknowledgment or the new proposed contract. Instead, after negotiations on the new contract failed, Kehoe formally notified LensCrafters in a June 30, 2001, letter that he would not be "renewing" his sublease. In response, LensCrafters sent Kehoe a letter confirming receipt of his June 30, 2001, letter, reiterating that LensCrafters had offered Kehoe a new sublease contract which Kehoe had decided not to "renew."

**{4}** Immediately after the contract expired in September 2001, Kehoe leased space from Pearle Vision in Coronado Center, less than one mile from his former location with

LensCrafters, which would have violated the time and geographic restrictions of the noncompete provision in the 1999 contract had it still been in effect. On October 2, 2001, LensCrafters sent Kehoe a letter demanding that Kehoe either stop practicing optometry at that location in violation of the noncompete provision or pay LensCrafters $75,000 in liquidated damages for the alleged violation. Ten days later, on October 12, 2001, LensCrafters filed a complaint against Kehoe in district court for damages and declaratory relief as a result of Kehoe's alleged breach of the noncompete provision.

**{5}** Kehoe answered LensCrafters' complaint, arguing that the noncompete provision was no longer in effect after LensCrafters terminated the contract with its nonrenewal letter. Kehoe also alleged numerous counterclaims against LensCrafters for improperly trying to enforce the noncompete provision; two of these are relevant to this appeal: malicious abuse of process and tortious interference with contract.

**{6}** Two years later, in July 2003, the district court granted partial summary judgment to Kehoe on LensCrafters' breach of contract claim, concluding that LensCrafters' nonrenewal letter had terminated the 1999 contract and its noncompete provision. Almost three years later, and just twelve days before the scheduled trial on the remaining claims and on the heels of a failed settlement conference, Kehoe asked the district court for a continuance to move to amend his counterclaims. The district court granted Kehoe's request. Soon thereafter, Kehoe filed a motion to amend his pleadings, adding two new tort claims and new allegations relating to his original tortious interference with contract counterclaims. Kehoe's amendments arose from LensCrafters' parent company's acquisition of Pearle Vision in 2004. Kehoe alleged that LensCrafters had used the acquisition to threaten loss of his sublease with Pearle Vision if he did not dismiss his counterclaims against LensCrafters.

**{7}** At the district court's request, Kehoe refiled his motion to amend as a motion to supplement under Rule 1-015(D) NMRA. *See* Rule 1-015(D) (stating that a supplemental pleading "set[s] forth transactions or occurrences or events which have happened since the date of the pleading sought to be supplemented"); *accord Elec. Supply Co. v. U.S. Fid. & Guar. Co.*, 79 N.M. 722, 725, 449 P.2d 324, 327 (1969) (explaining that supplemental pleadings involve matters that arise after an original pleading was filed and amended pleadings include matters that occurred before the original pleading was filed).

**{8}** LensCrafters opposed Kehoe's motion to supplement, arguing that Kehoe failed to establish all the elements of the new claims and that the claims were prejudicial because both parties' attorneys would need to testify if information from the failed settlement negotiations became admissible at trial, which could disqualify them as counsel at a late stage in the proceedings. After a hearing, the district court denied Kehoe's motion to supplement, noting both the failure to state new claims and prejudice to the opposing party.

**{9}** In November 2006, LensCrafters moved for summary judgment on several of Kehoe's counterclaims, including the malicious abuse of process and tortious interference

with contract claims, arguing that Kehoe failed to provide evidentiary support sufficient to establish genuine issues of material fact. The district court agreed, granting summary judgment to dismiss those claims. By mid-October 2007, the parties' remaining claims were concluded through summary judgment or by stipulation of the parties.

**{10}**     Both parties appealed their respective adverse rulings to the Court of Appeals, which, on the three issues relevant to this certiorari review, (1) by a majority vote (with Judge Garcia dissenting), reversed the summary judgment against LensCrafters' on its noncompete provision breach of contract claim, holding that the correspondence was sufficiently ambiguous to warrant trial; (2) unanimously affirmed the district court's denial of Kehoe's motion to supplement his pleadings; and (3) unanimously affirmed summary judgment dismissing Kehoe's two counterclaims. *See LensCrafters, Inc. v. Kehoe*, No. 28,145, slip op. at 11-12, 30-31 (N.M. Ct. App. Oct. 15, 2010).

**{11}**     We granted Kehoe's Petition for Writ of Certiorari, which asks us to review those three holdings, as well as a fourth issue—that LensCrafters' noncompete provision is contrary to public policy.

## II.     THE DISTRICT COURT PROPERLY ENTERED SUMMARY JUDGMENT DISMISSING LENSCRAFTERS' BREACH OF CONTRACT CLAIM.

**{12}**     "An appeal from the grant of a motion for summary judgment presents a question of law and is reviewed de novo." *Montgomery v. Lomos Altos, Inc.*, 2007-NMSC-002, ¶ 16, 141 N.M. 21, 150 P.3d 971. "Summary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." *Id.* (internal quotation marks and citation omitted). "All reasonable inferences are construed in favor of the non-moving party." *Id.* "On summary judgment, the non-movant may not rest on the pleadings, but must demonstrate genuine issues of material fact by way of sworn affidavits, depositions, and similar evidence." *Juneau v. Intel Corp.*, 2006-NMSC-002, ¶ 15, 139 N.M. 12, 127 P.3d 548.

**{13}**     Both parties agree that their 1999 contract and their 2001 correspondence are central to LensCrafters' noncompete provision breach of contract claim. When a contract dispute "depends upon the interpretation of documentary evidence, this Court is in as good a position as the trial court to interpret the evidence." *Kirkpatrick v. Introspect Healthcare Corp.*, 114 N.M. 706, 711, 845 P.2d 800, 805 (1992).

**{14}**     Section 17(C)(1) of the 1999 contract stated that the noncompete provision would remain in effect under three specific circumstances: "If this Sublease Agreement terminates because of [Kehoe]'s default or *[Kehoe]'s election not to renew under Section 2C* of this Sublease Agreement or if [Kehoe] has an uncured default at expiration . . . ." (Emphasis added.) Because there was no claim that the contract terminated as a result of Kehoe's default or that he had an uncured default at expiration, we need only address whether Kehoe elected not to renew the 1999 Sublease Agreement under the terms of Section 2(C).

4

**{15}** Section 2(C) of the contract contains two subsections. Section 2(C)(1) states that

> this Sublease Agreement shall be renewed for successive three (3) year terms if [Kehoe] gives LensCrafters written notice at least 120 days prior to the end of the then current term of [Kehoe]'s intent to renew; provided, however, *such notice shall be superseded if LensCrafters notifies [Kehoe]* in writing at least 120 days prior to the end of such term *of its intention to terminate* this Sublease Agreement at the end of the term. In the event of such notice from LensCrafters, the Sublease Agreement shall terminate at the end of the term.

(Emphasis added.) Section 2(C)(2) states that

> [a]ny renewal shall be on LensCrafters' then current form or term of sublease agreement which must be executed by [Kehoe] not less than 60 days prior to the end of the expiring term or *[Kehoe] will be deemed to have elected not to renew* under this Section.

(Emphasis added.)

**{16}** On May 29, 2001, more than 120 days prior to the end of the parties' contract, LensCrafters sent Kehoe its nonrenewal letter explicitly stating that the letter "serves as notice of nonrenewal of the Sublease Agreement dated October 1, 1999." At the bottom of the first page, LensCrafters included an acknowledgment provision that Kehoe was instructed to sign, which stated: "ACKNOWLEDGMENT I acknowledge the September 30, 2001, *termination* of the Sublease Agreement dated October 1, 1999, by and between Dennis Kehoe, O.D. and LensCrafters, Inc." (Emphasis added.) The letter also referred to an enclosed "new standard Sublease Agreement" that Kehoe was to sign if he "wish[ed] to continue the subleasing relationship."

**{17}** Although Kehoe had signed similar nonrenewal letters and accompanying new contracts from LensCrafters in 1998 and 1999 and had accepted a renewal of an existing contract in 2000, Kehoe chose not to sign the 2001 nonrenewal letter or accept LensCrafters' proposed new sublease agreement. Instead, Kehoe sent LensCrafters a letter on June 30, 2001, that stated, "This letter is to notify you that I will not be renewing my sublease with LensCrafters." LensCrafters responded by sending Kehoe a letter on July 18 to confirm receipt of Kehoe's June 30 letter, which it characterized as notice of "[Kehoe's] decision not to renew."

**{18}** This Court has recognized that "[a] contract is deemed ambiguous only if it is reasonably and fairly susceptible of different constructions." *Allsup's Convenience Stores, Inc. v. North River Ins. Co.*, 1999-NMSC-006, ¶ 27, 127 N.M. 1, 976 P.2d 1. "When the language of the contract clearly and unambiguously expresses the agreed-upon intent of the parties, this Court will give effect to such intent." *Kirkpatrick*, 114 N.M. at 711, 845 P.2d at 805; *see also Cont'l Potash, Inc. v. Freeport-McMoran, Inc.*, 115 N.M. 690, 704, 858 P.2d

5

66, 80 (1993) ("The purpose, meaning and intent of the parties to a contract is to be deduced from the language employed by them; and where such language is not ambiguous, it is conclusive." (internal quotation marks and citation omitted)). "The mere fact that the parties are in disagreement on the construction to be given does not necessarily establish ambiguity." *Vickers v. N. Am. Land Devs., Inc.*, 94 N.M. 65, 68, 607 P.2d 603, 606 (1980).

**{19}** The language of Section 2(C)(1) of the 1999 contract is clear and unambiguous: Kehoe had no power to renew the existing contract if LensCrafters notified him of its intention to terminate it in the manner set forth in that section. *See Smith v. Price's Creameries, Div. of Creamland Dairies, Inc.*, 98 N.M. 541, 546, 650 P.2d 825, 830 (1982) ("Where a contract provides for a manner by which termination can be effected, those provisions must ordinarily be enforced as written.")

**{20}** Based on the plain meaning of LensCrafters' nonrenewal letter, LensCrafters terminated the parties' 1999 contract and trumped Kehoe's ability to renew in compliance with Section 2(C)(1) by sending Kehoe written notice of express nonrenewal more than 120 days before the current contract ended and asking Kehoe to sign an acknowledgment of the current contract's termination. We agree with the Court of Appeals' dissenting opinion, in which Judge Garcia recognized the inherent fallacy of LensCrafters' argument. *See LensCrafters*, No. 28,145, slip op. at 34 (Garcia, J., dissenting) (stating that "LensCrafters argued and the majority has accepted the assertion that the May 2001 letter was an offer to either renew *or* terminate the existing sublease agreement, no different than in 1998 and 1999. This assertion is incompatible with Section 2C of the sublease."). Accordingly, LensCrafters' argument that it was Kehoe who had elected not to renew by sending his June 30, 2001, letter is without merit. His letter was a nullity. For the reasons that follow, we also find no merit in LensCrafters' argument that its nonrenewal letter could be interpreted as either a termination under Section 2(C)(1) or a renewal under Section 2(C)(2) sufficient to withstand summary judgment, the position adopted by the Court of Appeals majority. *See LensCrafters*, No. 28,145, slip op. at 11-12.

**{21}** First, LensCrafters argues that we should disregard the plain language of its nonrenewal letter because the precise word "terminate" was not used in the letter's main text. We disagree. The nonrenewal letter unequivocally accomplishes a termination under the requirements set forth in Section 2(C)(1). The second paragraph of the main text of LensCrafters' own letter instructed Kehoe to sign a provision drafted by LensCrafters that explicitly acknowledged *termination* of the 1999 contract. The first paragraph of the nonrenewal letter expressly stated that "[t]his letter serves as notice of *non-renewal* of the Sublease Agreement dated October 1, 1999." (Emphasis added.) *See American Heritage Dictionary of the English Language* 1477 (4th ed. 2000) (defining "renew" as including "arrange for the extension of" a contract); *see also Black's Law Dictionary* 1157 (9th ed. 2009) (defining "nonrenewal" as "failure to renew something"). The letter was sent more than 120 days prior to the end of the current contract term, as required by Section 2(C)(1). And the nonrenewal letter referred to an enclosed new proposed sublease contract that Kehoe was instructed to sign if he wished to continue subleasing space from LensCrafters. Based

on the plain meaning of these statements, we conclude that LensCrafters' nonrenewal letter clearly and unambiguously terminated the 1999 contract.

{22}    Second, LensCrafters argues that the parties' prior course of dealing indicates that LensCrafters' 2001 nonrenewal letter sought to renew the 1999 contract and not to terminate it. We disagree because the prior events lead to the opposite conclusion. LensCrafters sent Kehoe similar nonrenewal letters in 1998 and 1999, which also included new and different sublease contracts that Kehoe chose to sign, while in 2000 it sent an offer of renewal of the existing contract. Although the 2000 offer allowed Kehoe the option of renewal, the nonrenewal letters and offers in 1998, 1999, and 2001 superseded Kehoe's right to renew the existing contracts. Instead, LensCrafters terminated these contracts and offered Kehoe new proposed contracts to consider if he wished to continue with any sublease arrangement. In 1998 and 1999, Kehoe chose to bind himself to the new proposed contracts; in 2001 he elected not to do so. LensCrafters provides no support for its position that this Court should view the parties' course of dealings on certain prior occasions as anything other than terminations followed by new offers. *See Lee v. Lee (In re Adoption of Doe)*, 100 N.M. 764, 765, 676 P.2d 1329, 1330 (1984) (stating that when a party cites no authority to support an argument, we may assume that no such authority exists). LensCrafters' prior course of dealing argument not only ignores the history of the parties, it ignores Section 29, the contract's incorporation provision, which states, "This Sublease Agreement . . . supersedes all prior written or oral agreements and this agreement represents the entire understanding of LensCrafters and [Kehoe] . . . ." Accordingly, the parties' prior course of dealing does not overcome the plain meaning of LensCrafters' nonrenewal letter that terminated the parties' 1999 contract.

{23}    Third, LensCrafters argues that if its nonrenewal letter was notice of termination and not renewal, then Kehoe did not need to send his June 30, 2001, letter notifying LensCrafters that he was not renewing the sublease. LensCrafters' argument overlooks a crucial point. Even though Kehoe, a nonlawyer, may have used nontechnical language, his letter can only be construed as a rejection of LensCrafters' proposed new contract. Kehoe had no right to renew the 1999 contract because his right of renewal had already been superseded by LensCrafters' notice of termination. The only options available to Kehoe were to accept or reject LensCrafters' proposed new contract, removing any right on his part to decide whether to renew or not renew the 1999 contract under Section 2(C)(2).

{24}    Finally, LensCrafters argues that its nonrenewal letter was sufficiently ambiguous that summary judgment was improper, especially when the language of its nonrenewal letter is viewed in a light most favorable to LensCrafters as the nonmoving party. While we recognize the nonrenewal letter statement that LensCrafters was "offering [Kehoe] a renewal under its new current form of Sublease Agreement," the inclusion of this language does not overcome the fact that the letter served to terminate—not renew—the current contract and provide Kehoe with a new contract that would govern their relationship past 2001. Section 2(C)(1) did not grant LensCrafters the power to both renew and terminate the contract. LensCrafters cannot unilaterally create such a contractual right by its own assertion. *See*

*Wendenburg v. Allen Roofing Co.*, 104 N.M. 231, 233, 719 P.2d 809, 811 (1986) (stating that the terms of a contract cannot be changed unilaterally by one party). For this Court to conclude otherwise would allow LensCrafters to unilaterally impose new contract terms on Kehoe and to have it both ways—to terminate provisions it did not like in the old contract while purporting to bind Kehoe to its noncompete provision, in violation of the contract's plain terms.

**{25}** Accordingly, we reverse the majority opinion of the Court of Appeals and adopt the position of the dissent to affirm the district court's summary judgment dismissing LensCrafters' breach of contract claim. Because we conclude that the noncompete provision was terminated and made unenforceable by LensCrafters' nonrenewal letter, we do not need to address whether the provision would have been contrary to public policy.

### III. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DENYING KEHOE'S MOTION TO SUPPLEMENT HIS CLAIMS.

**{26}** Kehoe also has asked us to review the unanimous holding of the Court of Appeals that the district court did not abuse its discretion in denying Kehoe's belated motion to supplement his counterclaims against LensCrafters. His cursory briefing on this point relies only on the general proposition from a federal treatise, without referring to any judicial precedent from New Mexico or any other jurisdiction, that leave to supplement should be granted liberally. This is not sufficient to support a claim of abuse of discretion. *See Slide-A-Ride of Las Cruces, Inc. v. Citizens Bank of Las Cruces*, 105 N.M. 433, 436, 733 P.2d 1316, 1319 (1987) ("Simply alleging an abuse of discretion does not make it so.").

**{27}** The district court actually heard arguments and considered Kehoe's proposed new claims and evidence and concluded not only that the claims were insufficient as a matter of law but also that the late timing of Kehoe's request and the potential effect of disqualifying LensCrafters' counsel so late in the case were unfairly prejudicial. This Court has recognized that a request to amend a pleading may be properly denied "when the insufficiency or futility of the pleading is apparent on its face." *State v. Elec. City Supply Co.*, 74 N.M. 295, 299, 393 P.2d 325, 328 (1964). We have also recognized that prejudice will be found where a "party did not have a fair opportunity to defend the theory." *Bellet v. Grynberg*, 114 N.M. 690, 692, 845 P.2d 784, 786 (1992). Accordingly, we agree with the Court of Appeals that the district court exercised its permissible discretion in denying Kehoe's motion to supplement.

### IV. THE DISTRICT COURT PROPERLY ENTERED SUMMARY JUDGMENT DISMISSING KEHOE'S MALICIOUS ABUSE OF PROCESS AND TORTIOUS INTERFERENCE CLAIMS.

**{28}** The Court of Appeals also unanimously affirmed the district court's entry of summary judgment dismissing Kehoe's counterclaims for malicious abuse of process, tortious interference, civil conspiracy, unfair trade practices, breach of implied covenant of

good faith and fair dealing, unlawful restraint of trade, and duty of LensCrafters to defend and indemnify Kehoe against LensCrafters own lawsuit. *See Lenscrafters*, No. 28,145, slip op. at 3, 13-29, 31. In this Court, Kehoe continues only the first two of those claims. We address them individually.

## A.    Malicious Abuse of Process

**{29}**    New Mexico recognizes that "[i]n any malicious abuse of process claim, the use of process for an illegitimate purpose forms the basis of the tort." *Durham v. Guest*, 2009-NMSC-007, ¶ 31, 145 N.M. 694, 204 P.3d 19. The purpose of the tort is to discourage the misuse of our judicial system. *See id.* (explaining that "[w]hen the judicial process is used for an illegitimate purpose such as harassment, extortion, or delay, the party that is subject to the abuse suffers harm, as does the judicial system in general"). The tort is "disfavored in the law [b]ecause of the potential chilling effect on the right of access to the courts." *Fleetwood Retail Corp. of N.M. v. LeDoux*, 2007-NMSC-047, ¶ 19, 142 N.M. 150, 164 P.3d 31 (alternation in original) (internal quotation marks and citation omitted).

**{30}**    In a malicious abuse of process claim, a claimant must establish three elements: "(1) the use of process in a judicial proceeding that would be improper in the regular prosecution or defense of a claim or charge; (2) a primary motive in the use of process to accomplish an illegitimate end; and (3) damages." *Durham*, 2009-NMSC-007, ¶ 29. The first element—misuse of process—can be shown in one of two ways: "(1) filing a complaint without probable cause, or (2) an irregularity or impropriety suggesting extortion, delay, or harassment." *Id.* (internal quotation marks and citation omitted). Because Kehoe's claim is based solely on LensCrafters filing its lawsuit to enforce the noncompete provision, we need only address the first type of a malicious abuse of process claim: filing a complaint without probable cause.

**{31}**    To prove that a lawsuit lacks probable cause, a claimant must show that "the opponent did not hold a reasonable belief in the validity of the allegations of fact or law of the underlying claim." *DeVaney v. Thriftway Mktg. Corp.*, 1998-NMSC-001, ¶ 27, 124 N.M. 512, 953 P.2d 277, *overruled on other grounds by Durham*, 2009-NMSC-007, ¶ 29, *abrogated on other grounds by Fleetwood*, 2007-NMSC-047, ¶ 30. Because we do not want to discourage the fundamental "right of access to the courts," *Fleetwood*, 2007-NMSC-047, ¶ 19, the "lack of probable cause must be manifest," *id.* ¶ 13.

**{32}**    Several undisputed facts were before the district court when it granted summary judgment dismissing Kehoe's abuse of process claim: (1) the fact that there was an explicit noncompete provision in the parties' 1999 contract; (2) the inconsistencies in the three letters between the parties ending that contract, including Kehoe's June 30, 2001, letter expressing to LensCrafters his decision that *he* would "not be renewing" his sublease contract; and (3) Kehoe establishing an optometry practice with Pearle Vision that would have violated the time and geographic restrictions of the noncompete provision if a court determined that the provision were still lawfully in effect.

**{33}** The fact that this Court has determined that LensCrafters' nonrenewal letter had the effect of terminating the 1999 contract does not mean that LensCrafters lacked probable cause in exercising its right to seek a judicial determination of the dispute. Kehoe cites no precedent to support the proposition that a reviewing court's determination that summary judgment is appropriate equates to a lack of probable cause for seeking judicial relief, and we must assume that no such authority exists for such a sweeping proposition. *See In re Adoption of Doe*, 100 N.M. at 765, 676 P.2d at 1330. Despite the fact that this Court disagrees with the Court of Appeals, which disagreed with the district court on LensCrafters' breach of contract claim, it would be particularly ironic if we were to hold LensCrafters to a greater degree of prescience as to this Court's ultimate holding on the justiciability of its noncompete contract claim after a majority of the Court of Appeals concluded that the same claim was justiciable.

**{34}** The district court honored our admonition in *Fleetwood* "that a court's analysis of probable cause should be undertaken in a manner that will likely have the least chilling effect on a litigant's access to the courts." *Fleetwood*, 2007-NMSC-047, ¶ 20. We therefore hold that the district court correctly ruled that LensCrafters' suit was not filed in the absence of lawful probable cause.

**{35}** The initial existence of probable cause for LensCrafters' ultimately unsuccessful lawsuit makes it unnecessary to address Kehoe's allegations of a malicious motive. Even if we were to accept Kehoe's allegations as true, our law is clear that an improper motive by itself cannot sustain a malicious abuse of process claim. *See DeVaney*, 1998-NMSC-001, ¶ 20 ("[T]he filing of a proper complaint with probable cause, and without any overt misuse of process, will not subject a litigant to liability for malicious abuse of process, even if it is the result of a malicious motive."). As we have recently emphasized, a cause of action for malicious abuse of process requires not only "a primary motive in the use of process to accomplish an illegitimate end," but also "the use of process in a judicial proceeding that would be improper in the regular prosecution or defense of a claim or charge." *Durham*, 2009-NMSC-007, ¶ 36.

**{36}** Because Kehoe challenged only the filing of LensCrafters' lawsuit and no other procedural impropriety and because we conclude that the lawsuit was supported by probable cause, Kehoe did not establish an essential element of his malicious abuse of process claim as a matter of law. *See Mayfield Smithson Enters. v. Com-Quip, Inc.*, 120 N.M. 9, 16, 896 P.2d 1156, 1163 (1995) ("Summary judgment is appropriate when a defendant negates an essential element of the plaintiff's case by demonstrating the absence of an issue of fact regarding that element.").

**{37}** Accordingly, we agree with the unanimous Court of Appeals holding that the district court properly dismissed Kehoe's malicious abuse of process claim because Kehoe failed to establish an essential element of his claim—that LensCrafters' lawsuit lacked probable cause.

## B.       Tortious Interference with Contract

**{38}**    Because we previously concluded that Kehoe's motion to supplement his pleadings was properly denied, we review his tortious interference with contract counterclaim based on his original pleading. In his original pleading, Kehoe alleges that LensCrafters interfered with Kehoe's existing contract with Pearle Vision, with his prospective contracts with Pearle Vision, and with his patients at LensCrafters and Pearle Vision.

**{39}**    "In order to prove intentional interference with a contract, a plaintiff must establish that the defendant, without justification or privilege to do so, induces a third person not to perform a contract with another." *Deflon v. Sawyers*, 2006-NMSC-025, ¶ 16, 139 N.M. 637, 137 P.3d 577 (internal quotation marks and citation omitted). The analysis differs slightly depending on whether the interference involves an existing or a prospective contract. *See Fikes v. Furst*, 2003-NMSC-033, ¶ 22, 134 N.M. 602, 81 P.3d 545 ("When the interest at stake is an existing contractual relationship, a different analysis is appropriate than when the interest at stake is a prospective contractual relationship."). We first address Kehoe's intentional interference with an existing contract claim.

**{40}**    For tortious interference with an existing contract, a plaintiff must show that (1) the defendant had knowledge of the contract, (2) the plaintiff was unable to fulfill the contract's obligations, (3) the defendant played an active and substantial part in causing the plaintiff to lose the benefits of the contract, (4) the plaintiff suffered damages resulting from the breach, and (5) the defendant induced the breach without justification or privilege to do so. *See Deflon*, 2006-NMSC-025, ¶ 16.

**{41}**    In this case, both parties agree that Kehoe had a contract with Pearle Vision, which Kehoe admits expired in 2006 when Kehoe turned down a renewal offer from Pearle Vision in favor of a sublease agreement elsewhere. Although Kehoe argues that he chose not to renew his contract with Pearle Vision because of inappropriate pressuring from LensCrafters after the 2004 change in corporate ownership, the record shows no evidence to that effect before the district court. Kehoe offered no evidence showing he was unable to fulfill his contractual obligations with Pearle Vision, especially when that contract ended by its own terms in 2006. Nor did Kehoe show that LensCrafters played an active and substantial part in causing Kehoe to lose the benefits of his contract with Pearle Vision—a contract that terminated by its own terms. *See Totah Drilling Co. v. Abraham*, 64 N.M. 380, 385, 328 P.2d 1083, 1086 (1958) ("This court will not search the record in an effort to find facts with which to overturn the findings made by the lower court."). In fact, both the district court and the Court of Appeals correctly noted that Kehoe presented no evidence at all in opposition to LensCrafters' summary judgment motion. Accordingly, Kehoe fails to support at least two of the required elements of his claim of tortious interference with an existing contract. Thus, summary judgment dismissing that claim was proper.

**{42}**    We next address Kehoe's claim of tortious interference with a prospective contract. This Court has stated that

11

American courts are not as willing to protect interests in prospective contractual relations as they are to protect interests in existing contracts. Where the defendant is accused of interfering with the plaintiff's opportunity to enter into contracts with third persons, a strong showing must be made that the defendant acted not from a profit motive but from some other motive, such as personal vengeance or spite.

*Fikes*, 2003-NMSC-033, ¶ 22 (internal quotation marks and citation omitted); *see also id.* ¶ 23.

**{43}** Kehoe alleges that LensCrafters intentionally interfered with his prospective business relations with Pearle Vision by using its lawsuit to harm Kehoe's relationship with Pearle Vision. However, Kehoe was required to put forth evidence in the record showing that LensCrafters' primary motive for filing its lawsuit was personal vengeance or spite. Kehoe did not offer such evidence. Accordingly, the district court's dismissal of his claim on summary judgment was proper.

**{44}** Kehoe also alleges that LensCrafters intentionally interfered with his patients at LensCrafters by inappropriately asking him to steer patients to its store and provide his patient lists in violation of standard industry practices. Again, Kehoe fails to point to any evidence in the record that LensCrafters was acting beyond a profit motive, for personal vengeance or spite. Accordingly, the district court's dismissal of his claim on summary judgment was proper.

**{45}** Finally, Kehoe argues that LensCrafters intentionally interfered with his patients at Pearle Vision by providing false and misleading information to patients who tried to contact him after he left Pearle Vision. To support this allegation, Kehoe cites the deposition testimony of a patient who stated that she had called Pearle Vision and was not given sufficient information about Kehoe's new practice. However, even if we assume that someone intentionally misled the patient, her testimony alleges improper conduct by Pearle Vision and not LensCrafters. Accordingly, Kehoe's evidence is irrelevant to his claim.

**{46}** When asked by the district court at the hearing on summary judgment whether Kehoe had *any* evidence that LensCrafters had interfered with Kehoe's relationship with his patients, Kehoe claimed he had a sworn statement from another patient who testified that someone at LensCrafters told him that Kehoe had left town; however, the sworn statement was not in the record, and Kehoe could not produce it for the court. Instead, Kehoe argued that he could supplement the record with evidence of damages that LensCrafters had harmed Kehoe's business. Yet, as the district court noted at the hearing, evidence of damages was not enough to establish all the required elements of Kehoe's tort claim, including actual interference based on a motivation other than profit. Accordingly, the district court dismissed Kehoe's tortious interference with contract claims.

**{47}** Kehoe filed a motion to reconsider summary judgment on his tortious interference

with contract claims and included the statements of patients allegedly given misleading information by representatives of either LensCrafters or Pearle Vision. *See* Rule 1-060(B)(1)-(2) NMRA (stating that the court may relieve a party from an order for reasons including mistake, inadvertence, surprise, excusable neglect, and newly discovered evidence). However, Kehoe failed to justify the need for the district court's reconsideration based on any of the allowable exceptions such as mistake, surprise, or newly discovered evidence. *See id.* Accordingly, we conclude that the district court did not abuse its permissible discretion in denying Kehoe's motion to reconsider.

{48}    Because Kehoe did not put forth any relevant evidence beyond the allegations in his pleadings that LensCrafters intentionally interfered with his existing or prospective contractual relations, we again agree with the unanimous holding of the Court of Appeals that summary judgment on the tortious interference with contract counterclaims was proper.

## V.    CONCLUSION

{49}    We affirm the rulings of the district court and therefore (1) reverse the contrary ruling of the Court of Appeals reversing the district court's entry of summary judgment dismissing LensCrafters' breach of contract claim, (2) affirm the Court of Appeals' holding that the district court did not abuse its discretion when it denied Kehoe's motion to supplement his pleadings, and (3) affirm the Court of Appeals' affirmance of the district court's entry of summary judgment dismissing Kehoe's counterclaims for malicious abuse of process and tortious interference with contract.

{50}    **IT IS SO ORDERED.**

_____
**CHARLES W. DANIELS, Justice**

**WE CONCUR:**

_____
**PETRA JIMENEZ MAES, Chief Justice**

_____
**PATRICIO M. SERNA, Justice**

_____
**RICHARD C. BOSSON, Justice**

_____
**EDWARD L. CHÁVEZ, Justice**

**Topic Index for *Lenscrafters, Inc. v. Kehoe*, Docket No. 32,756**

13

**CIVIL PROCEDURE**
Summary Judgment

**CONTRACTS**
Ambiguous Contracts
Breach
Interference with Contract
Leases

**EMPLOYMENT LAW**
Covenant Not to Compete

**JUDGES**
Abuse of Discretion

**TORTS**
Abuse of Process
Interference with Contractual Relationship